## THE STATE v. EMMA CONDIT, Appellant.

### Division Two, March 19, 1925.

1. **STATEMENT OF CO-INDICTEE: Out of Defendant's Hearing: General Objection.** There having been no previous evidence indicating a conspiracy, a written confession made by defendant's co-indictee, made out of her presence, is pure hearsay, and inadmissible on any theory; even the portion of it which describes the homicide is not admissible against defendant for the purpose of establishing the *corpus delicti* or for any other purpose. And even though only a general objection was made to it at first, a later objection to the statement of the co-indictee made when he was showing the police over the place of the homicide "because the statement or alleged statement of the co-indictee and alleged accomplice of this defendant, all made out of her presence and introduced for the purpose of fastening the crime upon her" is sufficiently specific to apprise the court of its incompetency as hearsay.

2. **CONFESSION: Inadmissible: Subsequent Oral Statement.** The written confession of defendant having been extorted by illegal means, such as continuous questioning by the police for forty-three hours without rest, at a time when she was being held without warrant or authority and not permitted to see any of her relatives, and being therefore inadmissible, her alleged oral statements made in the presence of policemen a few minutes after her written confession was signed, and likewise the statement of the justice of the peace that, when she was brought before him, on the same day and after her husband's funeral, she said she wanted to plead guilty, were incompetent for the same reason, in the absence of a showing that when made the improper influences had been removed.

3. ——: ——: ——: **Continuation of Improper Influences.** The improper influences by which a written confession is extorted from a defendant are presumed to continue, and to have been present when subsequent oral statements to the same effect were made, in the absence of a showing that they had been removed.

4. ——: **Evidence of How Obtained.** Even if alleged written or oral confessions are admissible, it is error to exclude evidence showing how they were extorted.

5. **EVIDENCE: Other Insurance.** In the trial of a defendant charged with having entered into a conspiracy with her co-indictee to kill her husband in order to obtain the proceeds of insurance on his life in her favor in a certain company, evidence offered by her to explain her and her husband's attempts to get insurance in other companies, independently of her co-indictee and about which he knew nothing, is competent, where the State has attempted to establish the conspiracy and her guilt by the testimony of the co-indictee and of the agent of said company.

Citations to Headnotes: 1 to 4, Criminal Law, 16 C. J. 1314, 1480, 1481; 5, Homicide, 30 C. J. 415.

Appeal from Andrew Circuit Court.—*Hon. Thomas B. Buckner*, Special Judge.

REVERSED AND REMANDED.

*Maurice Murphy, K. D. Cross* and *Eastin & McNeely* for appellant.

(1) The written statements preceding the oral statements were not voluntary and not admissible. Therefore they were properly excluded. Greenleaf on Evidence (15 Ed.) sec. 219; Wharton's Crim. Evidence (10 Ed.) p. 1320; Underwood on Crim. Evidence, sec. 140; 12 Cyc. 464; State v. Brockman, 46 Mo. 566; State v. Powell, 258 Mo. 248, 266 Mo. 100; State v. Thomas, 250 Mo. 211; State v. Lewis, 273 Mo. 518; State v. Ellis, 294 Mo. 269, 24 L. R. A. 682; State v. Borello, 161 Cal. 367, 37 L. R. A. (N. S.) 434; Watts v. State, 99 Md. 30; Parker v. State, 46 Tex. Crim. 461, 80 S. W. 1008; Watts

State v. Condit.

v. United States, 20 App. D. C. 347; State v. Whitfield, 70 N. C. 356; State v. Carson, 36 S. C. 524; Hoober v. State, 81 Ala. 51; State v. Dougherty, 2 Tenn. (2 Over.) 80; State v. McCullum, 18 Wash. 394; Baum v. United States, 168 U. S. 532, 42 L. Ed. 568; State v. Nagle, 25 R. I. 105; People v. Prestige, 182 Mich. 80. (2) The written statements preceding the oral statements were procured through violation of the statutes, and through violation of, at least, the spirit of the Constitution. For that reason, also, they were properly excluded. U. S. Constitution, VI Amendment; Mo. Constitution, art. 2, sec. 22; R. S. 1919, secs. 3200, 3681; State v. Young, 119 Mo. 520; State v. Blackburn, 273 Mo. 482; State v. Thomas, 250 Mo. 211; Tucker v. Davis, 44 L. R. A. (N. S.) 1083, note; Purpura v. United States, 262 Fed. 473; Green v. State, 88 Ga. 516. (3) The written statements given at the police station, having been involuntary and illegally obtained, subsequent oral statements following in their wake will be presumed to have been the product of the same influence, and should also have been excluded. 16 C. J. 722; 6 Am. & Eng. Cyc. Law (2 Ed.) p. 542; State v. Ellis, 294 Mo. 269, 283, 24 A. L. R. 682; State v. Brown, 73 Mo. 631; Ammons v. State, 18 L. R. A. (N. S.) 857, note; People v. Stewart, 75 Mich. 21; Deathridge v. State, 33 Tenn. (1 Sneed) 75; Thompson v. Commonwealth, 20 Grat. (Va.) 724; State v. Force, 69 Neb. 162; State v. Miller, 68 Wash. 239; Owen v. State, 78 Ala. 425; State v. Guild, 10 N. J. L. 163, 18 Am. Dec. 404; 1 R. C. L. 573; State v. Chambers, 39 Iowa, 179; State v. Wood, 122 La. 1014; State v. Drake, 113 N. C. 624; Commonwealth v. Taylor, 5 Cush. (Mass.) 605; Lang v. State, 24 L. R. A. 690. (4) Since the court, nevertheless, did admit such subsequent oral statements, the weight, if any, to be given them was a question for the jury in the light of all the circumstances and events leading up to them, and the trial court erred in excluding, under the penalty of admitting the inadmissible written statements, any and all evidence of the events of the two days' inquisition immediately preceding such oral

statements. State v. McKinzie, 144 Mo. 48; Ammons v. State, 18 L. R. A. (N. S.) 866 and note; 1 R. C. L. 573, 574; Commonwealth v. Harmon, 4 Pa. St. (4 Barr) 269; People v. Barker, 60 Mich. 277; Spence v. State, 17 Ala. 192; State v. Wells, 35 Utah, 400; Milner v. State, 124 Ga. 86; White v. State, 129 Miss. 182, 24 A. L. R. 702. (5) It was error to exclude the testimony of the witness O. L. Tarvin and other evidence tending to show absence of conspiracy and to deny in that connection, the defendant's offer of proof showing how the insurance on the life of defendant and her husband came to be taken out and showing that it was not done pursuant to a conspiracy, but was done from independent causes and in good faith. 21 Cyc. 930; State v. Young, 119 Mo. 522; State v. Gabriel, 88 Mo. 638; Johnke v. State, 68 Neb. 154; Harrison v. State, 18 Ala. 5; Mathison v. State, 87 Miss. 739; Mutual Ins. Co. v. Hillmon, 145 U. S. 285. (6) It was error to receive in evidence, over defendant's objection, Whittaker's testimony as to alleged conversations with Rex, out of the hearing and presence of the defendant. The time at which some of said conversations were alleged to have been had is not fixed, and the time of others is clearly after the murder. State v. Hays, 249 S. W. 49; 16 Cyc. 1199; State v. Roberts, 201 Mo. 702; Brown v. United States, 150 U. S. 98, 37 L. Ed. 1010; 1 R. C. L. sec. 61, p. 520.

*Jesse W. Barrett*, Attorney-General, and *Harry L. Thomas*, Special Assistant Attorney-General, for respondent.

(1) The oral confessions of appellant, shown by the record to be purely voluntary, and found by the jury, under proper instruction, to be voluntary, were admissible. The trial court gave the appellant the benefit of the doubt in excluding the written confession at the first trial, although the State offered substantial evidence that the same was made voluntarily. The question as to whether the oral confessions were voluntary was prop-

erly submitted to the jury although there was no evidence offered by appellant that such confessions were involuntary, the making of such being denied by appellant's witnesses. State v. Ellis, 294 Mo. 269, 281; State v. Stibbens, 188 Mo. 387, 389. It affirmatively appears that all of the influences that might have attended the taking of the original statement had been fully removed. State v. Brown, 73 Mo. 631, 634. The making of the oral confessions was the only point in question. The State affirmatively showed that the confessions were voluntary. The appellant offered no evidence to the contrary. The evidence as to the written confession was therefore properly excluded. (2) The evidence was sufficient. To entitle the State to introduce in evidence against the person on trial the acts and declarations of another relative to the felonies charged, it is essential to the existence of a conspiracy that a common design or purpose between the defendant and the alleged co-conspirator to commit the crime be shown, but the law does not require direct and positive proof or evidence of such conspiracy. State v. Fields, 234 Mo. 615; State v. Roberts, 201 Mo. 702; State v. Darling, 99 Mo. 168; State v. Sykes, 191 Mo. 62. Where a conspiracy is established, the act or declaration of the common plot or undertaking is the act or declaration of all. State v. Walker, 98 Mo. 104.

WHITE, J.—On February 19, 1924, in a trial before a jury in the Circuit Court of Andrew County, the appellant was found guilty of murder in the first degree, and her punishment assessed at imprisonment for life in the penitentiary. She and one Bert Whittaker were jointly charged with the murder of her husband, Roy Lee Condit, March 26, 1923. There was a severance.

Almost the sole evidence against the appellant was the testimony of her co-indictee, Bert Whittaker, who, at the time of her trial, was confined in the penitentiary, having been convicted of the same murder and some confessions which the appellant is said to have made after she was arrested.

At the time of the trial the defendant, Emma Condit, was thirty-eight years of age. She married her husband in 1904. They lived in St. Joseph. Her husband was salesman for the Apex Electrical Company, and solicited business for the Standard Life Insurance Company. Defendant worked in St. Joseph as a cook at the Haber Hotel, across the street from the Union Station. Her hours at the hotel were from eight A. M. to two P. M., and from 5:30 P. M. to 7:30 P. M. She did her housework mornings, afternoons and evenings. They had no children.

On March 26, 1923, Roy Condit disappeared. Thirteen days later, on Sunday, April 8, 1923, his body was found by some fishermen, partly submerged in the Platte River near the line between Andrew County and Buchanan County. Barbed wire attached to a heavy rock was tied around one foot, a fur collar was tied over his head, and the body bound around the knees with rope. Examination of the body showed he had been clubbed to death by blows upon the head, and the body afterwards thrown into the river.

After the disappearance of her husband, the defendant made such inquiries as might be expected of an anxious wife, of persons who might know his whereabouts, including Whittaker. Roy Condit's father, O. S. Condit, and Roy's mother, his sister, Mrs. John Wasson, and the defendant's sister, Mrs. Courter, and her husband, lived across the Missouri River in Kansas at Troy and Wathena. At the time of the disappearance of Roy Condit, his brother, George Condit, had come recently from Louisiana and was visiting his relatives. All these, Roy Condit's relatives, as well as the defendant's relatives, stood by her and were witnesses in her behalf at the trial. Johnnie Wolf, a boy sixteen years of age, nephew of defendant, also was a witness in her behalf.

Bert Whittaker had been a friend of Roy Condit. The evidence shows they had been quite intimate for years, and that Whittaker often visited Condit at home. Roy Condit drank a great deal, was frequently drunk, and at such times was cruel to his wife.

On March 27th, the day following the disappearance of her husband, Emma Condit hired Whittaker to drive her over to Troy, Kansas, for the purpose of making inquiries about her husband, and afterwards, at her request, George Condit stayed at her house, reported the disappearance to the police, and apparently made every effort to find what had become of Roy Condit. 'On April 9th, after discovery of the body on April 8th, Emma Condit was arrested and taken to the police station. Bert Whittaker also had been arrested.

It was the theory of the State that the defendant, for the purpose of collecting life insurance, caused the death of her husband, and procured the assistance of Whittaker in making away with him. Mr. Cornelius, agent of the New York Life Insurance Company, testified that in November, 1922, he was given the names of the Condits by Bert Whittaker, as prospects interested in life insurance. Whittaker told him where to find Condit, and where to find his wife. He went to see Mrs. Condit about it, and later she came to his office, made application for insurance on herself in the sum of one thousand dollars in favor of her husband, and took an application to her husband. She and her husband returned to the office and a policy was issued on the life of each in favor of the other. Afterwards, an additional thousand was written on the life of Condit in favor of his wife. Cornelius said, "Well, at the time of making the original application I ordered the additional thousand myself, with the possibility of delivering it." Condit and his wife were present when the additional thousand was delivered. At the time of taking it out, Condit canceled $1100 insurance in the Eagles. According to Mrs. Condit, he always carried insurance. Whittaker testified that one Adams told him that Cornelius was going to split the commission with him (Adams), and that Adams was going to split commissions with Whittaker. This Whittaker gave as his original reason for suggesting the names of the Condits for insurance.

Whittaker, the principal witness for the State, besides being at the time an inmate of the penitentiary, after conviction of the same murder, admitted that he had served two other terms in penitentiaries, one in Nebraska and one in Missouri. After the arrest he signed a written statement in which he described the manner of Roy Condit's death, associating a man named Rex with himself in the commission of the crime. Rex appears in the record as a mysterious person whom nobody knew. Mrs. Condit testified that she had seen him once. Possibly another witness or two had seen him. The statement of Whittaker shows that he, Rex and Roy Condit, March 26, 1923, drove to the country to get some whiskey; that Condit and Rex were drinking. While they were driving on what he termed the East Savannah road, Rex, who was standing in the back end of the car, which had the top down, struck Condit on the head with a club. Condit got out of the car, and Rex hit him again and deliverately beat him with the club; he drew a gun on Whittaker, and told him to do what he was told or he would kill him. This appears to have been in Andrew County. The statement then tells how they stopped at an old well and got some rocks; how they got some barbed wire, tied the rocks to the body and threw it into the river. It described the occurrence as a cold-blooded murder on the part of Rex. Rex stayed in town two or three days and disappeared; Whittaker never told the police, nor made any complaint about it, because he was afraid. The statement goes further and connects Mrs. Condit with the killing. That part of it will be noticed below. This statement of Whittaker, excepting that part connecting Mrs. Condit with the murder, was read to the jury over the objection of the defendant. Officers who took the statement were then permitted to testify, over the objection of the defendant, that Whittaker took them over the road showing where the murder was committed, where they found the club with which it was done, pointed out the place where the rocks and the barbed wire were obtained, and the place where the body was thrown into the river.

Whittaker then was offered as a witness and testified that after the taking out of the insurance mentioned, Mrs. Condit told him that she now had a policy on her husband and she was ready for him to be "bumped off." He said that no offer was made to him except that Mrs. Condit asked him if he would do it, and he said, "No;" that she said she would split the insurance with anybody who would. He testified that he introduced Rex to Mrs. Condit, and that he told Rex about Mrs. Condit's proposition in regard to killing her husband, and the next morning after the murder Rex told him to see Mrs. Condit and have her send him (Rex) all the money she possibly could get hold of, that he had to leave town; that witness saw Mrs. Condit that morning, told her that Rex had killed Roy and thrown him in the river; told her to notify the police, that he was afraid to, that Rex threatened him.

He described his driving Mrs. Condit over to Troy, Kansas, the next morning after the disappearance to see her relatives. At that time John Wasson, her brother-in-law, gave her a check for $50 for a cow he had bought. On her return Mrs. Condit requested him to cash the check and he refused to do so. She then cashed the check and got the money, put it in an envelope and handed it to him saying: "Here is the two dollars for driving me over to Troy." That the envelope contained $50, which he afterwards gave to Rex. That is his testimony. His account of the murder was somewhat different from that in his original statement. He said that Rex and Roy were pretty drunk and got into a fight, and some people coming along wanted to know if assistance was needed and he told them he could separate them himself. This is his statement:

"I stopped when Rex hit Roy with—I don't know what he hit him with the first time—I know afterwards —after we got out of the car I took the club away from him and threw it away—I killed the engine when I stopped—when he struck the man Roy fell over to the side of the car and staggered out of the car and Rex

was right after him—I killed the engine and took out after Rex, Roy ran down the road a little ways, Rex after him, beating him all the time. I said, 'Rex, what are you trying to do, kill that man,' and he said, 'You are damn right.' "

He then described the disposition of the body as in his statement. In his original statement Whittaker said: "No one else had any hand in the murder." He *testified* that he had no knowledge that Rex was going to hit Roy; Rex had said nothing to him about killing him, and he considered it just a drunken fight. When asked what he did at the time, he said he sat there dumbfounded.

The defendant afterwards put in evidence that part of Whittaker's original confession which was not introduced by the State. In that confession he told the same story about the life insurance and testified that Mrs. Condit had often talked to him about the cruelty of her husband, and how she would like to get rid of him. He stated the same thing about introducing Rex to Mrs. Condit; said that nothing was said between Rex and Mrs. Condit in his presence in relation to getting rid of her husband; that he did not talk with Rex after the murder, that Rex just told him to keep his mouth shut; that Rex went through Roy's pockets after he was killed. He told about driving Mrs. Condit over to Kansas the day after the disappearance, but said nothing to her about the murder. He said he knew she knew it from her actions, *but he never said a word to her about it at any time; he never told her what happened to Roy*—in square contradiction of his testimony at the trial.

The State offered in evidence a written confession and several oral confessions made by the defendant while in custody. On the admissibility of this evidence the court had under consideration the evidence taken at a former trial out of the presence of the jury. This evidence shows that for about a week before the body of Roy Condit was discovered, the defendant did not go to work, but was sick, most of the time in bed, "up and down" as the witness described it, under the care of

physicians. The body was discovered on Sunday, and on Monday, April 9th, she was arrested. She was preparing to go to a physician to receive some kind of treatment, and was lying on the bed dressed. She was taken to the police station and retained there until Wednesday forenoon at 10:30, without a warrant, without any charge being filed against her, and then turned over to the sheriff and arraigned on that day, the 11th, before a justice of the peace. While she was in the custody of the police she was questioned by different members of the force in relays. She said they kept up the questioning until midnight or later Monday night and Tuesday night. On two occasions she was questioned by the prosecuting attorney for a long time; they did not stop examination for supper; she had nothing to eat during the period. They asked her about her family affairs; how she got along with her husband; if she had not been intimate with a man named Wildebour, and with a man named Whittaker, and continued to ask those questions after she had repudiated the suggestion. She asked to see Judge Culver, and Smith told her he would see Judge Culver and talk to him himself.

When the prosecuting attorney came to question her, Mr. Duncan, the Chief of Police, said: "This is Mr. DuVal Smith, the Prosecuting Attorney; he is a man who says whether you take the rope, or whether you take a life sentence, or what you take."

They told her that Whittaker had confessed and told all about it. They told her about other cases where confessions had been made by defendants who received a life sentence. According to her testimony they continued to grill her until finally she said, "I will say 'yes,' if you will just let me lie down." They would not let her lie down. Finally, she testified:

"I thought they were going to keep me there forever. I told them I would say anything they wanted me to say—I would say I was in that car and I killed my husband, or anything they wanted me to—if the others said I did—whatever they said I would say I did. . . .

They said they didn't want me to say I killed him—that I was in the car. They just wanted me to say I had helped to do it, or had helped Whittaker do it.''

In the meantime her friends were endeavoring to see her. George Condit, her husband's brother, made several visits to the police station, endeavoring to see her, and was put off by one excuse or another. Mr. Peter Courter, her sister's husband, made similar attempts with the same results. He employed an attorney for her, Mr. Murphy, who made two attempts to have an interview with the defendant and was refused. The prosecuting attorney was present on one occasion and participated in that refusal.

There was no contradiction of this testimony about the questioning of the defendant although several of the policemen and Mr. DuVal Smith were witnesses. They did not deny the rigid and long continued questionings to which she was subjected, nor deny the character of the questions, and no one denied the exclusion of her friends and her husband's relatives from her presence while she was being thus examined.

Wednesday forenoon, the 11th, her sister and Mr. Courter and other friends were allowed to see her, and she was allowed to go to the funeral of her husband which was that day. Immediately afterward she was taken to the justice of the peace and there arraigned.

As to her condition on the 12th of April, Dr. Shores testified that she was very nervous, excitable and crying most of the time, suspicious apparently; that he could not get her to answer questions definitely; apparently she had some difficulty, even in talking.

Dr. Lloyd J. Thompson, specialist in nervous and mental diseases, examined the defendant about 11:30 on the 12th of April, while she was in jail. He found her in a highly nervous condition, very emotional, crying a great deal, while he was examining her; instead of answering questions she would just repeat one phrase over and over; seemed to be confused. She resisted the examination. When they would start to examine her she

would get very restless. He found her physical condition good but "her reflexes were very lively," and her pupils did not react to light. Upon a hypothetical question, based upon the examination of her by the policeman, this physician stated she was not in a mental state to sign any statement Wednesday morning previous to his examination.

DuVal Smith, Prosecuting Attorney, in his testimony admitted that he questioned her for two hours; said she finally stated to him either Tuesday or Wednesday morning that she did not want any attorney, that she wanted to plead guilty to everything except the actual killing. That on Wednesday morning she signed a written statement which appears in questions and answers taken down by a stenographer, and amounts to a confession of guilty agency in procuring her husband's death, but differs widely from the testimony of Whittaker. The statement was excluded by the court, and its contents need not be set out.

Immediately after signing that statement she was allowed to see her sister and Mr. Murphy, her attorney. They came down stairs at the police station, and Mr. Rensch, Captain of St. Joseph Police Department, testified to what occurred.

"A. Mr. Murphy opened the conversation by saying: 'Mrs. Condit, I wish you would quiet down, you are out of your head and you do not know what you have been saying,' standing right there at her left. Her sister next spoke up and said: 'Yes, Emma, you are out of you head and you don't know what you have been saying.' She replied apparently to both of them by saying she was not out of her head, knew what she had said and what she had done, and that she wanted to get out of there and wanted to go to the county jail, wished to go to a speedy trial. She said: 'If I go to the penitentiary I will suffer the penalty, and if I am hung I will go where Roy is' and her sister—and then Mr. Murphy again questioned her about being out of her head, and her sister, apparently on the verge of tears, cautioned

her again and told her she was out of her head and had been for a month and didn't believe she did. this and they were going to defend her. She said she didn't want them to spend a dime on her, she was guilty, they were not to blame, she was sorry, but it could not be helped.''

Mr. Hartwig another policeman, testified that she said at the time, speaking to her sister: '' 'I don't want you to spend any money on me, you need your money for something else.' She said, 'I am guilty of everything but that murder.' ''

At that time, according to her sister, she was in a very nervous, excited condition, and hardly knew what she was saying. Immediately afterwards she was taken to the justice of the peace where she was arraigned and, according to the justice, he asked her if she wanted to waive a preliminary trial and she said, ''I want to plead guilty.'' He told her that was a justice's court and he could not sentence her for murder. At that moment Mr. Murphy stepped up and pleaded not guilty, for her. She denied that she made that statement as did Mr. Murphy. Mr. Murphy said he was not present when she was first brought into the justice's court.

Mr. J. H. Brown, jailer, swore that while she was in jail he heard her talking to some other women who were in the corridor with her, when she said she would like to plead guilty. She said she helped frame the case and knew he was going to be killed, but didn't know he was going to be killed so brutally.

The trial judge held that the written confession, signed by the defendant, was illegally obtained, because she was deprived of her liberty without due process of law, for a period of forty-three hours while she was being examined in relays by different people. Then, over the objection of the defendants, he permitted the State to introduce the oral confessions made later, the statement made down stairs at the police headquarters, the statement made before the justice of the peace, and statement testified to by jailer Brown. The defendant then offered to prove the facts relating to the detention and question-

ing of the defendant, and the refusal of the officers to allow her friends to see her, and all the evidence mentioned above and relating to the circumstances surrounding and inducing the confession.  This was refused.

A number of policemen were present all the time she was being examined; she was in charge of policemen at the time she came down stairs and made the statement testified to by the officers in the presence of her sister and Mr. Murphy; she was in charge of the officers when she was taken before the justice of the peace.  The evidence is not clear as to whether she went to her husband's funeral before being taken to the justice of the peace, or afterwards.  At any rate, it was the same day, April 11th.

Mrs. Condit testified at the trial, denying any knowledge of the death of her husband; she denied everything testified to by Whittaker about her wanting to get rid of her husband and employing him or Rex to have anything of that kind done.  She testified that she last saw her husband the afternoon he left; that he had money amounting altogether to about $65 or $70, which she had given him to pay house rent, grocery bills, and on the insurance policy.  Whittaker, in his confession, said that Rex robbed Condit's body, and the policemen in making the rounds with Whittaker found some small coin at the place where the murder was committed.  Mrs. Condit explained about the check for $50 given her by her brother-in-law, Wasson, when she visited him in Kansas the day after her husband disappeared.  She was corroborated by Mr. Wasson and other members of the family in relation to it.  He gave her $50 for a cow.  She had not asked him for the money, but he had volunteered to give her the check.  She took that check and the next day cashed it.  A friend of hers, Mrs. Donohue, indorsed the check so it could be cashed at the latter's bank.  Defendant took the money, put it in an envelope, and gave it to a Mrs. Shanks, a dining-room girl at the Haber Hotel, and asked her to have Mr. Haber put it in the vault at the hotel, where it remained until Saturday

evening, when she got it out. At the time of her arrest there was $43 in her pocketbook. She had spent the remainder of it. She introduced witnesses to show who were with her all the time, and under the circumstances she had no opportunity to slip the envelope with the money in it to Whittaker. The disposition of the money is fully accounted for by corroborating evidence as to her having put it in the vault at the hotel.

Numerous witnesses testified that the defendant had a good reputation. On this evidence defendant was found guilty, as stated and appealed.

I.   Almost at the beginning of the evidence the State offered, and the court admitted, the written confession of Whittaker. There had been no previous evidence indicating a conspiracy, and only that portion of a confession was offered which described the murder. In that connection the policemen also testified to going over the ground with Whittaker, and what he said in pointing out the spot of the murder, and other places affecting the commission of the crime. The court in admitting the confession and the statements of Whittaker stated that it was done merely for the purpose of establishing the *corpus delicti*.

**Hearsay: Statement of Coindictee.**

The evidence was pure hearsay and inadmissible on any theory. The Attorney-General says that no specific objection was made to it, but only general objections. True, a general objection was first made, but later defendant objected to the statement of Whittaker made when showing the police over the ground, because it was the "statement or alleged statement of the co-indictee and alleged accomplice of this defendant, all made out of her presence and introduced for the purpose of fastening the crime upon her." That same objection was made when Whittaker's written confession was offered. That objection was sufficiently specific to apprise the court of its incompetency as hearsay.

II.   The trial court excluded the written confession of the defendant on the ground that she had been, for forty-three hours without any rest, subjected to almost continuous questioning by the police officers, being held without warrant or authority, and not permitted to see any of her relatives, and the confession thus extorted by illegal means.

**Extortion.**

The alleged oral statements made by the defendant the same morning on which her written confession was signed, and a few minutes later after she was brought down stairs, were incompetent for the same reason. The influence which induced the first confession is presumed to have continued until the second, in the absence of a showing that such influence was removed. [State v. Ellis, 294 Mo. l. c. 283; State v. Hart, 292 Mo. l. c. 90, and cases cited.]   Instead of any indication that the improper influence had been removed, the evidence showed that it was continued.   According to the testimony of the policeman, when defendant was brought in, her sister and her attorney were expostulating with her, telling her she didn't know what she was saying, and defendant was saying she had been made to say a lot of things, some of which apparently she could not remember.

On the same day she went to her husband's funeral she was turned over to the sheriff and taken before a justice of the peace, who swore that she said she wanted to plead guilty, with not a particle of evidence to show that the improper influence had been removed.   On the contrary, physicians who examined her the next day, April 12th, testified that she was in a highly nervous condition, cried a great deal, was unable to understand or answer questions intelligently, and was in such a state that, if the evidence regarding the treatment to which she was subjected was true (and it was not contradicted), she was incapable of signing a written statement on the day previous.   There is not the slightest indication that the conditions or influences were at all different when she made these oral statements at the police station and at the justice's court.

Jailer Brown testified that he heard her talking with some other women in the corridor, and this is the way he describes her statement: "She said that she would like to plead guilty. She said she helped frame the case and knew he was going to be killed, but she didn't know he was going to be killed so brutal." The exact time of this alleged statement is not mentioned, and it cannot be said whether it was before or after she was arraigned before the justice of the peace; it differs from the other only in that no officers were present except the witness who apparently did not influence the statement. The statement gives no names, does not show to whom she refers, and there is nothing to indicate to the jailer what she was talking about except for his knowledge of her case. In the way that evidence was admitted it was incompetent without a further showing of the time and circumstances under which it was made, and some showing that the original influences had been removed.

If these alleged confessions had been admissible, the court further erred in refusing to admit the evidence showing how they were extorted.

III. Error is assigned to the action of the court in excluding evidence offered by the defendant to explain about her attempts to get insurance from other companies. It was charged that she had formed a conspiracy with Whittaker who aided her in getting insurance for the purpose of dividing the proceeds after the commission of the murder. The evidence offered was to show that she and her husband were getting other insurance independent of Whittaker, about which he knew nothing. It was competent.

Other Insurance.

IV. Complaint is made of the action of the court in refusing to disqualify the sheriff in summoning the jury and in the remarks of State's counsel in the closing argument. Neither of these alleged errors is likely to occur at another trial.

Other Assignments.

Many other errors are complained of by appellant. Probably some of which complaints are not without

merit, but we feel that on another trial they probably will not recur.

Roy Condit was robbed as well as murdered and the money he had on his person, $60 or $70, was apparently sufficient incentive to commit the crime. According to Whittaker, Rex did the job for $50. In fact, the evidence shows no other inducement, for the body was hid where the murderer no doubt thought it would not be found, making it impossible to collect insurance on account of death which could not be proven.

Except the testimony of Whittaker there was no *competent* evidence of any act of defendant, or of any circumstance, which was not consistent with her innocence. The evidence shows the murdered man's father, mother, brother and sister believed her innocent.

For the errors mentioned the judgment is reversed and the cause remanded. *Blair, J.*, concurs; *Walker, P. J.*, not sitting.