THE STATE v. MAURICE W. NAGLE, Appellant.—32 S. W. (2d) 596.

Division Two, November 15, 1930.

J. *Francis O'Sullivan* for appellant.

*Stratton Shartel,* Attorney-General, and *Don Purteet,* Assistant Attorney-General, for respondent.

HENWOOD, C.—By an information filed in the Circuit Court of Jackson County, this defendant, Carl Nasello, John Messino, Tony Mangercino and three others were jointly charged with the murder of James H. Smith, a traffic officer in Kansas City, Missouri. Severances were taken, and, at a separate trial, the jury found this defendant guilty of murder in the first degree and assessed his punishment at imprisonment in the penitentiary for life. He was sentenced accordingly, and appealed. [Companion cases heretofore decided by this court are State v. Nasello, 325 Mo. 442, 30 S. W. (2d) 132; State v. Messino, 325 Mo. 743, 30 S. W. (2d) 750, and State v. Mangercino, 325 Mo. 794, 30 S. W. (2d) 763.]

With reference to the alleged murder of officer Smith, the evidence adduced by the State is substantially as follows: About 9:20 in the morning of June 14, 1928, several men entered the building occupied by the Home Trust Company on the east side of Walnut Street, between Eleventh and Twelfth streets, in Kansas City, Missouri, and, with revolvers and a sawed-off shotgun, "held up" the officers and employees of the trust company and robbed that institution of about $19,000, in money and interest coupons on United States Liberty Bonds. While the robbery was in progress, Messino was seen in the driver's seat of a Buick coach automobile standing in front of the trust company and headed north on Walnut Street. Upon leaving the trust company, the robbers entered the Buick coach, which then was driven north on Walnut Street at a rapid rate of speed, its occupants, seven in number, brandishing revolvers, a sawed-off shotgun and a machine gun, and firing numerous shots in the air. Officer Smith was in charge of traffic at the intersection of Eleventh and Walnut streets, and, when his attention was attracted by these shots, he left his station in the middle of the intersection and ran or walked rapidly south on Walnut Street about fifty feet, in the direction of the approaching Buick coach, where he was shot three times with a sawed-off shotgun by one of the occupants of the Buick coach. He fell, mortally wounded, and died about six o'clock in the evening of that day. Nasello was one of the men who entered the trust company and aided in the robbery, and he and Mangercino were among the occupants of the Buick coach as it left the scene of the robbery. Messino was driving the Buick coach as it proceeded north on Walnut Street. After the Buick coach passed the safety zone at the intersection of Eleventh and Walnut streets, it was discovered that the "safety zone standard" had been knocked down, and, nearby, a nickel-plated auto-

mobile door handle was picked up and handed to a police officer. Shortly after the robbery, a Buick coach with six or seven occupants stopped at the intersection of Eleventh and Charlotte streets, where four of the occupants got out. Two of them entered another automobile which was driven north on Charlotte Street, and the other two entered another automobile which was driven south on Charlotte Street. As the Buick coach started east on Eleventh Street, a shotgun was dropped from it, and one of the occupants got out and picked up the shotgun. Then, the Buick coach was driven east on Eleventh Street. On the day after the robbery, partly-burned pieces of some of the interest coupons taken from the trust company by the robbers, two masks, several revolvers, a shotgun, a machine gun and some shotgun shells were found in a vacant house, in the southeast section of Kansas City.

The State did not contend at the trial, and there is no evidence tending to show, that the defendant actually participated in the robbery or in the killing of officer Smith. The theory of the State at the trial was that the defendant permitted Messino to use his Buick coach in the robbery of the trust company with the understanding that he (the defendant) would get a share of the loot. The following is a summary of the evidence adduced by the State in support of this theory: On June 14, 1928, the day of the robbery, and for sometime prior thereto, the defendant owned a Buick coach, and Messino owned a Chrysler roadster, which were kept at the Trafficway Garage in Kansas City. Both Messino and Mangercino drove the defendant's Buick coach "now and then," and the defendant drove Messino's Chrysler roadster "now and then." Messino brought the defendant's Buick coach to the Trafficway Garage the night of June 13, 1928, and the next morning, the morning of the robbery, "about twenty or twenty-five minutes till nine," he came to the Trafficway Garage and got the defendant's Buick coach. "Another fellow," an Italian, was with Messino. Between nine and 9:30 that morning, one of the employees of the Trafficway Garage delivered Messino's Chrysler roadster to the defendant at Thirteenth and Jefferson streets, in response to a telephone call "for it." About 10:30 or eleven o'clock that morning, a garage at 1241 Jefferson Street in Kansas City was rented "for a couple of days," and a Buick coach placed therein, by a man unknown to the owner of the garage. Later that day, the owner of the garage discovered that the garage door was locked with a padlock. After reading a newspaper story of the robbery and the shooting of officer Smith, he informed police officers of the Buick coach in his garage. Messino bought a padlock, that day, from the Bunting Hardware Company. That night, when police officers removed the Buick coach from the garage, the windshield was out, the door handle of the door on the

right side was gone, there were "bullet holes over the radiator," and it bore license tags numbered "3-807 Missouri." These license tags were issued to the defendant "on a Buick coach, 1927 model," in 1928, by the Missouri State License Bureau in Kansas City. The missing door handle was the one found in the safety zone at the intersection of Eleventh and Walnut streets. A key to the lock in this door handle and a key to the padlock on the door of the garage at 1241 Jefferson Street were among the keys found on the defendant's person when he was arrested at 8:30 in the evening of the day of the robbery. Another key to this padlock was found in the possession of Messino.

Over the objections of the defendant, Mr. James R. Page, Prosecuting Attorney of Jackson County, in testifying for the State, was permitted to read to the jury a transcript of his stenographer's shorthand notes of a conversation had between him and the defendant in his (the Prosecuting Attorney's) office about noon on June 16, 1928. Said transcript reads as follows:

"The witness Page here reading from statement of defendant as follows:

"Q. Are you Mr. Nagle? A. Yes, sir.

"Page: Now, Mr. Nagle, I am going to read to you the statement which you signed over to the Police Department and if there is anything wrong about it, any mistakes in it, or any corrections that ought to be made, why, tell me and we will make them—and if there is anything wrong about it, any mistakes in it, or any corrections that ought to be made, why, tell me and we will make them.

"Nagle: Will I be allowed an attorney?

"Page: You know whether or not there is anything wrong about this statement without an attorney, don't you?

"Nagle: Yes, sir.

"Mr. Page, reading from statement made by Maurice W. Nagle:

" 'My name is Maurice W. Nagle. I am twenty-seven years old, am married and I live with my wife at the Charleston Apartments.'

"Page: Is that right?

"Nagle: Yes, sir.

"Page: It is not in the statement, but where is the Charleston Apartments located?

"Nagle: I do not know the exact address, but it is at 13th and Jefferson.

"Mr. Page, again reading from statement:

" 'I have known John Messino about four years and I have known Tony Mangeracino about a year. I think I met Tony Balano about last August. Night before last, June 13, 1928, I gave John Messino permission to use my car. The car is a Master-Six Buick coach, model 27-40. He told me the car was to be used on a job on Walnut

Street and it was my understanding that it was to be within the next twenty-four hours.'

"PAGE: Is that right?

"NAGLE: Yes, sir.

"MR. PAGE, again reading from statement:

" 'When he took the car he told me to meet him at 43rd and Benton Blvd. Thursday morning at ten o'clock. I was informed to call the Trafficway Garage and have the Chrysler roadster delivered to me.'

"MR. PAGE: Is that right?

"NAGLE: Yes, sir.

"PAGE: You see what I am doing? I am striking out the word 'bank,' that is right, isn't it?

"NAGLE: Yes, sir.

"MR. PAGE, again reading from statement:

" 'The driver from the garage brought me the Chrysler car shortly after nine o'clock, I believe it was about 9:15, and he went back to the garage where the garage attendant was.'

"PAGE: Did you know this attendant?

"NAGLE: No, only that my car was kept in that garage and several times he had brought my car to me.

"PAGE: Did you ever hear his first name? Or any nickname?

"NAGLE: No, I have never spoken a word to him except to get the car and drive it back.

"MR. PAGE, again reading from statement:

" 'My wife and I went to Sanderson's restaurant on East 8th Street and ate breakfast and then drove to 43rd and Benton Blvd. After waiting considerable time Messino and a companion drove up from the south on Benton Blvd. in my car. On changing cars I noticed the windshield on my car was broken completely out and a hole in the dash, which looked as though it was a bullet hole. I sent my wife to town on a bus. Messino and his companion drove south on Benton and I drove my car to 13th and Jefferson, parking on the east side of Jefferson, just south of 13th Street. Messino later came to in front of the apartment.'

"PAGE: That doesn't sound right, does it? It sounds as if he were unconscious. Look, I am changing it to 'came to the front of the apartment.'

"MR. PAGE, again reading from statement:

" 'Messino and his companion came to the front of the apartment and informed me that I had better get the car off of the street. He suggested that I rent a garage, which I did, 1241 Jefferson.'

"NAGLE: I am not positive about the address, but Mr. Thurman says that 1241 Jefferson is the address.

"MR. PAGE, again reading from statement:

" 'I paid a week's storage on the car at the garage and Messino backed the car into the garage and we drove to Bunting-Stone Hardware company and purchased a padlock and we drove back to the garage and I placed the lock on the door. When Messino asked me to use my car he gave me to understand that I was to receive a pecuniary reimbursement, no stated amount being mentioned. When I went to get out of my car at 13th and Jefferson from 43rd and Benton, I noticed that the handle on the right door was broken off. After we put the car in the garage at 1241 Jefferson, Messino told me that he would have the car fixed up. While we were at 43rd and Benton changing cars I asked Messino what luck he had, and he told me, "God damn little." I met Messino about six o'clock and my wife and I and Johnny went out to Meyer's barbecue and got some sandwiches.'

"PAGE: Whom do you mean by Johnny?

"NAGLE: John Messino.

"MR. PAGE, again reading from statement:

" 'We then came back to the apartment about 8:30 last night. When we walked into my apartment we were met by the officers and arrested. I did not take any actual part in the holdup and make this statement of my own free will, no threats or promises being made to me.

" ' (Signed) MAURICE W. NAGLE.'

"PAGE: And then you made another short statement after that?

"NAGLE: Yes, sir, an additional statement.

"MR. PAGE, reading additional statement:

" 'In addition to the statement made this morning I want to add that from the 24th day of February, 1928, to the 31st day of May, I was given $800 for the use of my car, which was used in the City Bank holdup on February 24th. This money was given to me by John Messino at my house 1104 Broadway where I was living at the time.

" ' (Signed) MAURICE W. NAGLE.'

"NAGLE: Most of that statement was dictated by Officer Kellerstrauss, except the part about the house. I haven't any actual knowledge of my car being used in the bank holdup.

"PAGE: Nagle, you dictated your statement to the girl just as it happened?

"NAGLE: Yes, sir.

"Statement dictated by Nagle:

" 'Maurice W. Nagle, 27 years old, first being duly sworn upon his oath states:

" 'My name is Maurice W. Nagle. I am 27 years old and married and live at the Charleston Apartments. In addition to the statement I made this morning, I want to add—That during the period

from February 24, 1928, until March 5th, I was given $800 by John Messino. This money was given to me by John Messino at my house at 1104 Broadway where I was living at that time.

"'(Signed) MAURICE W. NAGLE.'"

The defendant testified: At the time in question, he was twenty-seven years of age, and employed by the Western Auto Supply Company at Kansas City, and living in the Charleston Apartments at Thirteenth and Jefferson streets in Kansas City. He was away from Kansas City on a vacation, from May 29 to June 12, 1928, visiting with his wife's relatives near Ellsworth, Kansas, and with his own relatives in Oklahoma City, Oklahoma. He did not see Messino, nor talk to him, from May 29, 1928, until June 14, 1928, the day of the robbery and alleged murder of officer Smith. He used his Buick coach the night of June 13, 1928, and turned it over to an employee of the Trafficway Garage that night, in front of the Charleston Apartments, for the purpose of having it taken to the garage. About 8:30 the next morning, Messino called him, at his home, over the telephone, and told him that he (Messino) was going to use his (the defendant's) Buick coach for an hour and a half or two hours, and suggested that he (the defendant) get his (Messino's) Chrysler roadster at the garage and meet him (Messino) at Forty-third Street and Benton Boulevard about ten o'clock. He had never driven Messino's car before. He called the garage, from his home, over the telephone, and, in response to his request, Messino's car was delivered to him at his home between nine and 9:30 that morning. He and his wife went to Sanderson's Restaurant on Eighth Street for breakfast, and from there to Forty-third Street and Benton Boulevard, in Messino's car, where, after waiting about fifteen minutes for Messino, they exchanged cars with Messino and "some companion." It was then about ten or 10:15. He noticed the windshield was out of his car, and asked Messino about it. Messino replied: "I am in a hurry, I will tell you about it when I come back to the apartment." He drove his car to his home in the Charleston Apartments, and, on the way, discovered that there was "a bullet hole in the dash." Upon reaching his home, about eleven o'clock, he parked his car on the east side of Jefferson Street. Within a short time thereafter, and while he was reading a newspaper story of the robbery of the trust company and shooting of officer Smith, Messino came to his home. He said to Messino: "Johnnie, did you rob this bank with my car?" Messino replied: "No, sir." He (the defendant) then said: "Let's take this (car) to the police department and explain, because I am liable to get into a whole lot of trouble down there." Messino replied: "You can't explain anything there; you don't know anything about it. The less you know about it the better off you will be. If you take that (car) to the police station

and can't explain what happened to it, you will get your brains beaten out; and, if you do explain, you will be taken out on one of these highways.'' When Messino left the apartment about noon, he (Messino) said he would ''take care'' of the car. He (the defendant) never saw his car after that. He remained at home until six o'clock in the evening, when Messino came back and took him and his wife, in Messino's car, to Myers' Barbecue Stand at Swope Park for supper. Upon returning to his home about 8:30 that evening, he was arrested. He did not know what disposition Messino made of his (the defendant's) car. He did not rent the garage at 1241 Jefferson Street, where his car was found, and never had a key to the padlock found on the door of that garage.

Numerous witnesses testified to the defendant's good reputation for industry, honesty, morality and law-abiding citizenship.

Other pertinent evidence and proceedings will be hereinafter noted.

Counsel for the defendant earnestly contends, and the Attorney-General, with commendable frankness, concedes, and, after a careful examination of the record, we have concluded, that the confession of the defendant to the prosecuting attorney was not a voluntary confession, and, therefore, should not have been admitted in evidence, and that, with the confession stricken down, the evidence is not sufficient to sustain the verdict and judgment of conviction in this case.

I. It will be noted that, in the conversation between the prosecuting attorney and the defendant on June 16, 1928, the prosecuting attorney merely read to the defendant the statements signed by him at police headquarters the day before, and the defendant confirmed said statements as they were read to him.

On the preliminary inquiry as to the competency of the confession, the trial judge refused to hear any evidence except as to what occurred in the prosecuting attorney's office at the time of the conversation between the prosecuting attorney and the defendant. The defendant offered to testify that, from about 8:30 in the evening of June 14th, when he was arrested, until about noon on June 16th, when he was taken to the prosecuting attorney's office, he was sweated almost continuously by various police officers and detectives, who kicked him, beat him with a rubber hose, struck him with a revolver, a chair and a blackjack, and squeezed and twisted his testicles, and refused to let him sleep and to let him have anything to eat or drink, and threatened to kill him, in their efforts to force him to admit that he actually participated in the robbery and the killing of officer Smith and to inform them as to others who participated in the perpetration of said crimes; that, by means of said

mistreatment, torture, threats and coercion, he was forced, at police headquarters on June 15th, to sign the first statement about nine o'clock in the morning of June 15th, and to sign the additional statement sometime in the afternoon of that day, without first having an opportunity to read said statements and without having said statements read to him; that, about noon on June 16th, he was taken from police headquarters to the prosecuting attorney's office by two detectives, Thurman and Kellerstrauss, who had actively participated in the mistreatment, torture, threats and coercion to which he had been subjected at police headquarters; that, immediately before he was taken into the office of the prosecuting attorney, he was told by Thurman that, unless, when questioned by the prosecuting attorney, he confirmed the statements signed by him at police headquarters, they (the detectives) would take him back to police headquarters and "finish" him; that Thurman remained in the prosecuting attorney's office throughout his (the defendant's) conversation with the prosecuting attorney; that, at the time of said conversation, he was suffering from the lack of sleep and food and from the injuries inflicted upon him by said police officers and detectives; and that he confirmed the statements signed by him at police headquarters, when the same were read to him by the prosecuting attorney, because he was afraid he would be subjected to further mistreatment and torture at the hands of said police officers and detectives if he did not do so. And the defendant offered to show that, on June 18, 1928, upon his motion, a commission of physicians was appointed, by one of the judges of the Circuit Court of Jackson County, to make a physical examination of him. And he, also, offered to show, by the testimony of two of said physicians, that, on June 21, 1928, they made a physical examination of him in the county jail, and found him suffering from two deep scalp wounds, an ecchymosis of both lower eyelids or "black eyes," a broken rib on his left side, and numerous bruises and abrasions on his left side and on his shins

The action of the trial judge in refusing to hear and consider the evidence so proffered by the defendant was clearly erroneous and highly prejudicial to the defendant. "When there is reason to believe that the confessions were obtained by the influence of hope or fear, it becomes the duty of the judge to hear the evidence and determine whether it shall go to the jury. Whether the confessions were made with that degree of freedom which allows of their admission, is a preliminary question for the judge to determine. This is the long-settled rule in this State." [State v. Kinder, 96 Mo. l. c. 550, 10 S. W. 77. See, also, State v. Thomas, 250 Mo. 189, 157 S. W. 330.]

However, we have considered the confession in the light of the evidence heard and considered by the trial judge. The prosecuting attorney, in his testimony concerning his conversation with the defendant, admitted that, when officer Thurman brought the defendant into his office, about noon on June 16th, the defendant had "some blood on the left side of his coat," and "one eye had an abrasion over it;" that he did not ask the defendant what had happened; that he was present on June 18th, representing the State, when one of the judges of the Circuit Court of Jackson County heard the defendant's motion for the appointment of a commission of physicians to make a physical examination of him; and that, during the course of that proceeding, he said: "Nobody denies that they (referring to the defendant and his codefendants) were beaten up." In answering the question as to whether or not he made that statement, he said: "I think that is true—before they were brought to my office." And, when asked if it was customary "to have them beaten up before they got there," he said: "Apparently someone had done something of that kind before he (the defendant) got there." A photograph of the defendant, taken in the prosecuting attorney's office on June 16th, immediately before his conversation with the prosecuting attorney, shows that his face, under both eyes, was swollen and discolored, and that there were numerous dark spots or stains on the left side of his coat, on the left shoulder and the left side of the collar. Other photographs of the defendant, taken in the county jail on June 20th, show a deep scalp wound at or near the crown of his head and numerous bruises and abrasions on his left side and on both of his shins.

This evidence furnishes ample support for the conclusion that the statements signed by the defendant at police headquarters on June 15th were not signed by him voluntarily, but as the result of fear and intimidation. [State v. Powell, 258 Mo. 239, 167 S. W. 559; State v. Powell (same case), 266 Mo. 100, 180 S. W. 851; State v. Ellis, 294 Mo. 269, 242 S. W. 952; State v. Condit, 307 Mo. 393, 270 S. W. 286.] Indeed, the record shows that such was the impression of the prosecuting attorney and the trial judge. The prosecuting attorney did not offer these statements as confessions made by the defendant at police headquarters on June 15th, and the trial judge said he would exclude "statements taken at the police station" because they were "probably" involuntary.

But, these statements were offered and admitted in evidence as a part of the defendant's conversation with the prosecuting attorney on June 16th, when the defendant confirmed them as they were read to him. "Where a confession has been obtained under circumstances rendering it involuntary and inadmissible, a presumption exists that any subsequent confession arose from a continuance

of the prior influence, and this presumption must be overcome before the subsequent confession can be received in evidence. The controlling influence which produced the prior confession is presumed to continue until its cessation is affirmatively shown, and evidence to overcome or to rebut this presumption must be very clear, strong, and satisfactory; if there is any doubt on this point, the confession must be excluded." [16 C. J. 722-723.] This rule has been quite uniformly followed in this and other jurisdictions for a long time. [See State v. Jones, 54 Mo. 478; State v. Brown, 73 Mo. 631; State v. Ellis, supra; State v. Condit, supra.]

The prosecuting attorney and his stenographer, Miss Rose Shapiro, testified that they did not see any weapons exhibited nor hear any threats made by anyone during the conversation between the prosecuting attorney and the defendant, but the State made no effort to show that the influences of fear and intimidation had been removed, and that the defendant was no longer dominated by such influences, at the time of his conversation with the prosecuting attorney. There is nothing to indicate that the defendant requested a conference with the prosecuting attorney. On the contrary, it appears that officer Thurman "brought" him to the prosecuting attorney's office after he had been "beaten up" at police headquarters, and that officer Thurman was present when the prosecuting attorney "interviewed" the defendant. And it further appears that, when the prosecuting attorney confronted the defendant with the statements signed by him at police headquarters, the defendant asked, and was refused, the privilege of talking to an attorney before he was questioned by the prosecuting attorney concerning these statements.

Under such circumstances, it must be presumed that the defendant's confession to the prosecuting attorney was involuntary, and, for that reason, it should have been excluded.

II. This brings us to a consideration of the evidence, exclusive of the confession.

On substantially the same evidence, relating to the robbery and the killing of officer Smith, this court affirmed the convictions of Nasello, Messino and Mangercino (325 Mo. 442, 743, 794, 30 S. W. (2d) 132, 750 and 763), and the evidence is amply sufficient to support the finding that Nasello, Messino and Mangercino and their coconspirators used the defendant's Buick coach automobile in the perpetration of the robbery, and that they were fleeing from the scene of the robbery in said automobile at the time officer Smith was shot by one of them. But, as we have already said, the State did not contend at the trial, and there is no evidence tending to show, that the defendant actually

participated in the robbery or in the killing of officer Smith. It was the theory of the State at the trial that the defendant permitted Messino to use his automobile in the perpetration of the robbery with the understanding that he (the defendant) would get a share of the loot.

With the confession excluded, the State's case rests upon circumstantial evidence only. In such cases, "the circumstances, to warrant a conviction, must be consistent with each other, must tend to prove guilt, and not only must be consistent with the hypothesis of the defendant's guilt, but must be inconsistent with every other reasonable hypothesis, including the hypothesis of his innocence." [16 C. J. 1011.] Measured by this yardstick, the evidence in this case falls short. In other words, all of the facts and circumstances shown by the evidence can be taken as true and the defendant, nevertheless, be innocent of the crime charged. [See State v. Morney, 196 Mo. 43, 93 S. W. 1117.] True, the defendant's close companionship with Messino on the day of the robbery, his exchange of automobiles with Messino shortly before and shortly after the robbery, the concealment of his automobile in a stranger's garage after the robbery, and his possession of a key to that garage at the time of his arrest, raise a strong suspicion of his participation in the conspiracy to commit the robbery, but the State failed to show, by any substantial evidence, that his automobile was used in the perpetration of the robbery with his knowledge and consent. "Mere suspicion, however strong, will not supply the place of evidence, when life or liberty is at stake." [State v. Jones, 106 Mo. l. c. 313, 17 S. W. l. c. 369.] And a verdict based upon mere suspicion will not be permitted to stand. [State v. Perkins (Mo. Sup.), 18 S. W. (2d) 6; State v. Matticker (Mo. Sup.), 22 S. W. (2d) 647; State v. McMurphy (Mo. Sup.), 25 S. W. (2d) 79.]

Our review of the record has satisfied us that the discovery of any additional proof against the defendant is very improbable, and that nothing would be accomplished by remanding this case for another trial.

The judgment is reversed and the defendant discharged. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. *Blair, P. J.,* and *White, J.,* concur; *Walker, J.,* absent.