THE STATE v. OSCAR ROWE, Appellant.—24 S. W. (2d) 1032.

Division Two, February 19, 1930.

*Fred W. Coon, Horace Guffin* and *Forest W. Hanna* for appellant.

866

*Stratton Shartel,* Attorney-General, and *Ray Weightman,* Assistant Attorney-General, for respondent.

DAVIS, C.—The grand jury of Jackson County returned an indictment in the circuit court charging defendant with the offense of giving to Arch Duncan corn whiskey. On a trial, the defendant was found guilty by the verdict of the jury, and his punishment assessed at five years' imprisonment in the penitentiary. He appealed from the judgment entered on the verdict.

The evidence adduced on behalf of the State warrants the finding that on November 5, 1928, and prior thereto and thereafter, defendant was the lessee and in possession of premises located at and known as 602 Main Street in Kansas City. The lease to defendant designated the use of the premises as a soft-drink parlor and a cigar store. The evidence tends to show that defendant operated on the ground floor a restaurant in the front and a gambling establishment in the rear. On the second floor he operated a house of prostitution and Pete Rafferty was his manager. On the premises he sold whiskey. One police officer, a witness for defendant, said the place was what the officers knew as a den of thieves. On said day defendant was a precinct captain for the Republican party and was a worker relative to the election of November 6, 1928, commonly called the Presidential election.

Some time during the summer of 1928 defendant spoke of getting the Democratic voters drunk to prevent their voting. On October 7, 1928, at 602 Main Street, in speaking of election day, he said in the presence of one Keller: "Well, we have got it all arranged: we are going to have a good liquor party; we will get these voters drunk."

On the morning of November 5, 1928, defendant, one Keller, one James Grant and others were present at 602 Main Street. About nine o'clock that morning defendant and Keller, as Keller testified, went to the police garage, where defendant obtained about

twenty-five gallons of whiskey, and, in defendant's automobile, they transported it to 602 Main Street. At the direction of defendant, around noon, Grant went to the police garage and returned with some gallons of whiskey. About one o'clock that afternoon, defendant, Grant and their associates, together with four police detectives, to-wit, officers Morley, King, Red Perrin and one other, whose name could not be remembered, again went to the police garage for whiskey. Three cars were used in thus going, a truck, defendant's car and the officers' car. The truck was driven by an employee of defendant, and it was used to transport whiskey from the police garage to 602 Main Street. In all, sixty-five gallons of corn whiskey were transported by defendant and his associates and employees from the police garage to 602 Main Street on November 5, 1928.

Later that afternoon defendant said that "he wanted to give this whiskey to Al Smith voters so as to get them drunk and keep them from voting." Pursuant thereto, he told his associates and scouts to go out and get all the men wearing Al Smith buttons and bring them in to 602 Main Street. Among the men thus accosted were Arch Duncan and his brother. They were invited into 602 Main Street. Defendant and his associates poured the whiskey from the containers procured from the police garage into quart bottles and served it in tin cups and glasses. Defendant was there and gave it to his confederates to distribute. A band was provided to lure men in and it was playing. The announced lure to the men was whiskey, and, upon this failing to entice them, music was mentioned. When Duncan entered about fifty men were present. Duncan was tendered a drink and he took it and tasted it; but, as it had a queer taste, he refused to drink more. Others in the place were given whiskey. When the men in the room reached a certain stage of intoxication, they were dragged to the basement. Defendant's associates would lift the heads of the drunken men in the basement and pour whiskey down their throats. Some two hundred men were in the basement in all stages of intoxication. Some were pitifully drunk and lying on the floor. The valuables of those lured into the place were taken and retained. Around two o'clock A. M. on November 6, 1928, the police wagons arrived. The wagons were used to convey the drunken men found in the basement to the holdover. No charges were preferred against them. They were there detained until about six-thirty P. M. on the evening of November 6, 1928, when they were released.

The evidence further tends to show that, after the men were lured into 602 Main Street, they were prevented from departing by defendant's associates stationed at the doors. These associates or guards were armed with riot guns and revolvers. Some of the riot guns and sawed-off shotguns were brought to 602 Main Street by the police. Moreover, guards were stationed at the windows on the second and third floors, as well as at the doors on the ground floor, with riot guns,

sawed-off shotguns and 30-30 rifles to prevent a rescue of the men detained by defendant and his confederates. Defendant told Keller that he had arranged with the police department to use the riot guns. About ten P. M. on the night of November 5, 1928, two police officers in uniform drove up and carried the guns away.

Keller admitted, on cross-examination, that, when he was a boy, he had been convicted and sentenced to two years in the penitentiary; but he said the court paroled him and that he joined the Army and was honorably discharged.

Grant said that he acted as defendant's body guard. He had been convicted and served a term in the Nebraska penitentiary for attempted robbery. He was then under indictment in Kansas City for highway robbery.

Defendant's evidence tended to show, by the testimony of six witnesses, that on the night of November 5, 1928, between the hours of six and eleven, the defendant was present at a ward meeting at Republican headquarters at Ninth and Walnut streets in Kansas City. The defendant offered in evidence court records to the effect that defendant had theretofore been tried for giving away whiskey, on November 5, 1928, to certain designated parties other than Arch Duncan. The court sustained an objection to this offer of proof. Other facts pertinent to the issues raised will be adverted to in the opinion.

I. (a) Defendant avers that the trial court erred in admitting evidence tending to show that defendant was guilty of crimes separate and distinct from the offense charged. It is complained in the brief that one Grant, a State's witness, was permitted to testify that men gambled in the rear of premises 602 Main Street, and that upstairs defendant had a lot of hustling girls and a booze joint. We are unable to find, either expressly or impliedly, in the motion for a new trial an assignment of error justifying our consideration of the admission of this testimony. The motion charges error as to the admission of specified testimony of certain witnesses, but it does not in any wise predicate error on the admission of testimony given by the witness Grant. Nor does the motion for a new trial generally preserve the question. Consequently, the question is not before us.

(b) It is next said that the court erred in permitting Keller, the State's witness, to testify that defendant operated 602 Main Street as a gambling and booze joint, equipped with craps and black-jack tables, with a stock of liquor in the basement. Also, that he was permitted to testify that men gambled and whiskey was sold in the place without reference to the date of the crime charged. This contention calls for a recital of the evidence as shown in the bill of exceptions:

"Q. Do you know what his business was at that time or on up to last November? A. Yes, sir.

"Q. What was his business? A. Running immoral houses and bootlegging places.

"Q. Name some of the places that he owned and operated.

"MR. COON: Now, if the court please, I know what this man is going to testify to, of course, but I object to this line of testimony and ask Mr. Gabriel to confine him down to the time in question.

"MR. GABRIEL: I will bring him down.

"MR. COON: Well, get down right now.

"MR. GABRIEL: I will get down right now.

"Q. (BY MR. GABRIEL): Name the places that he operated last November.

"MR. COON: I object to that, if the court please, as highly immaterial.

"BY THE COURT: Well, state whether he operated a place at 602 Main Street.

"Q. (BY MR. GABRIEL): All right; did he operate a place at 602 Main Street? A. Yes, sir; he did.

"Q. What kind of a place did he operate there?

"MR. COON: I object to that, if the court please, because that is just calling for a conclusion.

"Q. (BY MR. GABRIEL): Well, if he knows. Were you in it? A. Yes, sir.

"Q. How often? A. Oh, several times.

"Q. Tell what they did there. A. Why they gambled there and sold whiskey.

"MR. COON: I object to that, if the court please. That has nothing to do with the charge in this case whatever.

"THE COURT: Objection overruled.

"MR. COON: We except.

"To which action and ruling of the court, the defendant at the time duly excepted and still excepts.

"MR. GABRIEL: It certainly is charged that they gave him the whiskey and this witness will prove it.

"THE COURT: Objection overruled. Proceed.

"MR. COON: We except.

"To which action and ruling of the court, the defendant at the time duly excepted and still excepts.

"Q. (BY. MR. GABRIEL): What was the arrangement inside for the gambling and the whiskey? What did they have? A. Well, they had a restaurant in the front end and the partition off there, a billiard table for a crap table, poker tables and also a black-jack table.

"Q. What about the liquor? How did they dispense that? A. They kept it down in the basement and brought it up as they came in and wanted it. They kept a half-pint bottle at the back door."

It will be noted that the evidence, that defendant ran immoral houses and bootlegging places, came in without objection and was permitted to stand without a motion to strike it out and without a request that the jury be instructed to disregard it. Moreover, it is not assigned as error in the motion for a new trial. Notwithstanding, defendant complains of the admission of the evidence that defendant operated a gambling house and sold whiskey at 602 Main Street. It will be noted further that in every instance the questions were asked and the answers returned before defendant's counsel interposed an objection. He permitted the witness to answer and then objected. Moreover, the objections were not put on the ground that the evidence involved other crimes. The defendant failed to advise the court upon the question put that he had an objection, but he waited until the answer was given and he deemed it prejudicial to him. [16 C. J. 874.] Even though the evidence as to the operation of a gambling house and booze joint by defendant at 602 Main Street was inadmissible, yet, as neither a timely objection was interposed, nor a motion to strike out the evidence was made, the trial court ought not to be and cannot be convicted of error. That defendant was in possession and control of the premises at 602 Main Street is shown by the lease and other facts and circumstances in evidence. So, when the evidence, without objection, came in that defendant was running immoral houses and bootlegging places, and that they gambled and sold whiskey at 602 Main Street, it results that prejudicial error cannot be predicated on the situation.

(c) The defendant avers that the court erred in permitting witness Keller for the State to testify that defendant had one Rafferty to shoot him, and later to beat him up while he was on crutches.

On cross-examination in response to defendant's inquiry, Keller stated that he had no personal or ill-feeling against defendant, but on further inquiry he admitted that he theretofore said in substance that, as an American citizen, he would see him (defendant) in the penitentiary. On redirect examination, the court on objection refused to permit the State to read the testimony of Keller given in the justice court, but advised the State that it could interrogate the witness as to his feeling. No objection was interposed. Thereupon the State asked Keller what occasioned the remark that he, as an American citizen, thought defendant ought to be in the penitentiary? The witness replied that defendant had him shot last July. The defendant, after the question had been answered, on the ground that the question was asked to prejudice the jury, moved to strike out the answer and to instruct the jury to disregard it. A later reason given by defendant was that it had nothing to do with the

case. On further inquiry, witness stated "Oscar Rowe had Skeets Rafferty to shoot me and then I went to the hospital." Defendant, after the question had been answered, objected for the reason that witness says Oscar Rowe had Skeets Rafferty to shoot him. The court said, "If you are objecting on the ground that it is a conclusion, the objection will be sustained." Defendant stood mute. The witness, in reply to a question, answered: "Well, sir, it was about a month ago. I was down in the North End and Oscar Rowe—Skeets Rafferty took a club,—besides, I was on crutches anyway—and knocked me down a flight of stairs." Defendant objected and moved to strike out the answer, because it had no place whatever in the trial of this case; because it had nothing to do with the guilt or innocence of defendant on trial; and because it had no other purpose than to prejudice the jury against defendant. The objection was overruled and the State inquired: "Now, what conversation did Rowe have with you at that time? What was it he wanted you to do for him? A. Well, sir, Oscar Rowe wanted me to be a witness. Q. In what case? A. In the trial previous to this one. Q. Similar to this? A. Yes, sir. Q. All right; what was the conversation?" Defendant objected because it had nothing to do with the facts in this case; and because it had reference to a trial then concluded. The objection was overruled and witness answered: "He said, 'I want you to testify.' He says, 'That I was not at 602 Main Street the night before election,' and I said, 'I won't testify for you or nobody else,' and he said, 'Well, I will have you bumped off,' and which they did pretty nearly have me the next following day. Q. And that is why you say that he ought to be in the penitentiary? A. And then I say that the law, as an American citizen, should take their course and that such men as that should be in the penitentiary."

The gist of the preceding evidence develops an attempt on the part of defendant, by threats and violence, to prevent the witness from testifying against him. The evidence was admissible in chief, irrespective of an explanation (State v. Anslinger, 171 Mo. 600, 71 S. W. 1041), as tending to show by conduct the unrighteousness of defendant's cause and his consciousness of guilt. [State v. Mathews, 202 Mo. 143, 100 S. W. 420; State v. Tippett, 317 Mo. 319, 296 S. W. 132.] The evidence that defendant had him shot came in without objection. It is true that defendant moved to strike out the answer and to instruct the jury to disregard it, but the reasons given amounted to nothing more than that the evidence was irrelevant. That, as we have shown, was not a proper or sufficient ground on which to sustain the objection, for the evidence was admissible to show an attempt to suppress evidence by threats and violence. Even if the objection as later made was sufficient to render it inadmissible on the ground that defendant had Skeets Rafferty shoot the witness, yet

the court seemed to sustain the objection; but, if it did not, defendant failed to except or request a further ruling. Even though the threats and violence related to a previous trial, nevertheless the context shows that it was connected with defendant's presence at 602 Main Street the night before election, thus involving the identical facts and subject-matter.

II. (a) Defendant complains of the conduct and argument of the prosecuting attorney. He avers that it is impossible for the cold record to show the expression of countenance and the tone of voice employed by him in his great zeal to secure defendant's conviction. If the record does not show it, then we may not consider it, for the granting of a new trial on that ground is peculiarly within the province of the trial court. Moreover, the motion for a new trial fails to make such complaint.

(b) However, defendant specifically complains in his brief that the prosecuting attorney, in his opening statement, told the jury that the guards at 602 Main Street struck Arch Duncan on the nose and detained him with his nose bleeding and his face and clothes covered with blood; that men were piled up like rats, one on the other at 602 Main Street; and that men, prior to an invitation to enter 602 Main Street, were asked if they were Democratic voters.

Even though the prosecuting attorney, in his opening statement, states facts which are not followed by proof, nevertheless if he acts in good faith and with reasonable grounds for supposing that he will be able to show the facts stated, the statement is not error. The rule is stated in State v. Rasco, 239 Mo. 535, l. c. 579, 144 S. W. 449, reading: "The defendant predicates a charge of bad faith upon the mere fact that the evidence was not produced. This is not enough. There is nothing in the record to indicate that the prosecutor did not expect, when he made the statement, to produce such testimony. He may have had reasonable grounds then to believe that such evidence was available. Surely there is nothing shown in the record on this point which will warrant a reversal." [State v. Pleake, 177 S. W. 355.] It is true that the exact evidence was not produced by the State, but the evidence tends to show that Arch Duncan was armstrung and that some of the men were beaten and bruised; that the basement was filled with men and that defendant's confederates would come down and set and hold the men up and pour whiskey down their throats; and that before entering they were approached with the statement, "We are giving away a little election whiskey up here. Do you boys want a drink?" and that defendant said he wanted to give this whiskey to Al Smith voters so as to get them drunk and keep them from voting. We surmise that the failure of the prosecut-

ing attorney to fully corroborate his opening statement, if anything, militated against the State. In any event, prejudicial error was not present.

(c) Defendant complains of the following:

"Q. Do you know whether it was 602 Main? A. Yes, sir. I think that is what it was.

"MR. COON: Now, anything else you want to suggest to him, Mr. Gabriel, or testify yourself in this case?

"MR. GABRIEL: No; I think not. You are keeping me from suggesting a lot of things I would like to tell the jury. If you turn me loose, I will tell them a lot.

"MR. COON: I object to that and counsel should be reprimanded.

"THE COURT: I am going to instruct the jury now to pay no attention to counsel at the counsel table, to any repartee at the counsel table."

Defendant charges that the statement of the prosecuting attorney constituted error. However, the matter is not before us because the motion for a new trial does not preserve the question.

III. Although defendant does not mention it in his brief, the motion for a new trial assigns as error the statement of the prosecuting attorney in his argument to the jury that the men there were given poisonous whiskey until they became so stupid that they could not stand up. The record shows that the defendant objected to the statement relative to giving the poisonous whiskey, and, upon the prosecuting attorney saying, "All whiskey is poison," defendant asked the court to reprimand counsel, and to instruct the jury to disregard the remark, as well as that the jury be discharged, and also the defendant. The court overruled the requests, and defendant excepted and saved an exception. Thereupon the prosecuting attorney said: "All whiskey is poison; and all this corn whiskey you get down here is poison. I am not saying it in this case, but you know it has killed many a man."

. A witness for the State testified that defendant, on the afternoon of the day preceding the election, obtained some chloral, and, on returning to 602 Main Street, referring to five-gallon containers, said, "How much of this stuff do you put in there?" The court sustained an objection and instructed the jury to disregard the evidence.

The context shows that the initial use of the words "poisonous whiskey" was figurative, for the thought carried was that the men became so stupid that they could not stand up. It is a matter of common knowledge that an excessive amount of whiskey stupefies the senses and renders physical powers impotent. The prosecuting attorney in his argument said nothing about the use of chloral. Moreover,

the evidence that the court instructed the jury to disregard does not show that chloral was put in the whiskey. The thought of the prosecuting attorney went no further than that all whiskey in sufficient quantities is intoxicating and stupefying and thus poisonous. Medically speaking, to intoxicate means to poison, and is derived from the Latin word "intoxico," translated "to poison." We cannot speculate that the jury disregarded the instructions of the court with respect to the evidence relating to chloral. Moreover, in view of the evidence that the men lying on the floor in the basement were stupefied, the prosecuting attorny could properly denominate the whiskey poisonous, especially as he did not refer to chloral in his argument.

IV. (a) Defendant complains in his brief that the court erred in failing to instruct the jury relative to the credibility of the evidence of the State's witnesses, Keller and Grant, who were co-conspirators or accomplices. While defendant assigns that matter  as error in his motion for a new trial, he did not offer an instruction in regard thereto. This matter was collateral and did not involve the law of the case. The law of the case involves only the elements of the offense. As defendant did not offer an instruction of this nature, a complaint in the motion for a new trial fails to raise the collateral question on appeal. [State v. Sandoe, 316 Mo. 55, 289 S. W. 890; State v. Conrad, 14 S. W. (2d) 608; State v. Daugherty, 302 Mo. 638, 259 S. W. 787.] However, when the motion for a new trial complains of the failure of the trial court to give a certain instruction involving the law of the case, then we must notice it, irrespective of whether such an instruction was requested. The same ruling for the same reasons applies to the error charged that the court failed to instruct on the defense of alibi.

(b) Complaint is made in regard to the court's Instructions Five and Eight. They involve the responsibility of one conspirator for the acts of another. It is said that the instructions are identical and for that reason the duplication was prejudicial to defendant. Instruction Five reads: "All persons are equally guilty who act together with a common intent in the commission of a crime, and a crime so committed by two or more persons acting jointly is the act of all and each one so acting." Instruction Eight comprised three paragraphs, and the first paragraph was practically identical with Instruction Five. We are unable to comprehend that the mere duplication in Instruction Eight of the concept of Instruction Five amounted to prejudicial error.

V. (a) Defendant does not brief it, but in his motion for a new trial he assigns as error, the refusal of the court to instruct the jury

to acquit him. There is substantial evidence in the record that defendant and his confederates executed a common design and understanding to procure whiskey, to gather Democratic voters into 602 Main Street, a place occupied and controlled by defendant, and to detain them by giving them whiskey and by force so as to prevent their voting the next day; and that, in pursuance to the scheme, defendant poured whiskey from containers into bottles, from which one of his confederates gave corn whiskey to Arch Duncan. This evidence tended to show a conspiracy and defendant was responsible for any overt act done by one of his confederates in pursuance of the conspiracy. [See opinion of WHITE, C., in State v. West, 246 S. W. 541, and cases cited.]

(b) It is further said that Section 21, page 242, Laws 1923, does not comprehend the giving away of *hootch, moonshine, corn whiskey,* when done as a mere act of courtesy or hospitality. We need not decide that question, although there is authority on the subject. [State v. Fulks, 207 Mo. 26, 105 S. W. 733, 15 L. R. A. (N. S.) 430.] The act of defendant was neither a social act, nor an act of courtesy or hospitality. It was an unfriendly and hostile act. It was a sinister, wicked and harmful act, and was designed to betray and to deprive men of their rights. [State v. Handler, 178 Mo. 38, 76 S. W. 984.] Consequently, the section comprehends the act of defendant.

VI. Defendant's final contention in his brief reads: "Defendant was not given a fair and impartial trial to which every citizen is entitled under our Constitution and laws." This contention is too general, for nowhere therein does defendant point to specific error. Consequently, this assignment does not raise a question of error that we may consider. It is not even assigned as error in the motion for a new trial.

VII. There are other assignments of error in the motion for a new trial, which are not briefed. However, we have examined and considered them and find them without merit. Moreover, we find the record proper sufficient in form and substance and free from error.

The judgment is affirmed. *Henwood* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. *Blair, P. J.,* and *White, J.,* concur; *Walker, J.,* absent.