The State v. Carl Nasello, Appellant.—30 S. W. (2d) 132.

Division Two, June 11, 1930.

444

446

*Edward J. Curtin* and *E. M. Tipton* for appellant.

*Stratton Shartel,* Attorney-General, and *Don Purteet,* Assistant Attorney-General, for respondent; *Otto & Potter* of counsel.

456

DAVIS, C.—In a verified information filed in the Circuit Court of Jackson County by the prosecuting attorney, defendant and others were charged with murder in the first degree with the killing of one James H. Smith. Upon a severance taken, defendant was tried to a jury. The verdict of the jury was guilty of murder in the first degree, as charged in the information, and the punishment assessed was death. After an unsuccessful motion for a new trial, the court entered judgment in accordance with the verdict. Defendant appealed.

The evidence submitted on behalf of the State warrants the finding that, on June 14, 1928, at Kansas City, in the County of Jackson, the Home Trust Company, at 1117-19 Walnut Street, operated a banking institution. Between nine-twenty and nine-thirty on that morning, while the officers and employees of the banking institution were about their duties, five or six men, masked and with revolvers and shotguns, appeared in the foyer of the institution. At once a command was heard, "Hands up! This is a real holdup." The president and other officials were ordered to lie on the floor, face down, behind a partition in the foyer. One of the men went to a cage in which a teller kept money. When he was first observed, his face from his eyes down was covered by a mask of cloth, but immediately thereafter it fell from his face and hung around his neck, with his face observable. An employee of the bank in the teller's cage and a customer making a deposit identified this man during the trial as defendant. Defendant gathered up the money in the cage, and upon the cry that they were being gassed due to the explosion of a gas tear-bomb into the foyer by an employee on·the steps leading from the basement below, the men departed forthwith. Over $19,000 in money, and in addition some Liberty-bond coupons, were taken. On the street in front of the institution confederates sat in a Buick coach. The robbers, upon leaving the trust company, boarded the coach in which their confederates awaited them, which then proceeded north on Walnut Street some few blocks

until trace of it was lost for the nonce. The coach was later discovered in a garage rented by Messino. It was identified as used in the escape by a broken door-handle found in the street, which was knocked off by contact with a traffic sign. Various witnesses testified that the coach on leaving the scene of the holdup ran at a rate of speed of from fifteen to thirty-five miles an hour. As the car ran, its occupants brandished revolvers, a sawed-off shotgun and a machine gun, and fired in the air and along the street. At Eleventh and Walnut streets police officer James H. Smith, in charge of traffic, was shot by some occupant of the Buick as it went north. Small bullets, said to be buckshot, penetrated the right side of his neck and chin, causing him to die the same day. Bullets also hit and wounded a young woman in the line of firing. As the car sped north, two witnesses, who were acquainted with defendant by sight, identified him as an occupant of the Buick. One of the witnesses said that three men were in the front seat of the Buick, and that defendant sat next to the right-hand door, with a revolver in his hand, shooting. At Tenth and Walnut police officer Capshaw, in uniform, was shot in the leg.

On June 15, 1928, the day succeeding the holdup, city detective Browning searched a vacant bungalow in southeast Kansas City, near the Municipal Farm. He there discovered a machine gun, a shotgun, revolvers, ammunition, material for masks and burned and charred coupons. The charred coupons were identified as taken from the trust company in the robbery of June 14, 1928. There was also found a Smith & Wesson revolver bearing number 552981. It was shown that on December 26, 1927, this revolver passed from the possession of the assistant manager of the Main Street Theatre to the possession of defendant.

Defendant's evidence tends to show that he did not participate in the robbery of the trust company, and that he was not an occupant of the Buick in which the robbers made their getaway. It tends to show an alibi. On the morning of the robbery it warrants the finding that he ate breakfast with his family, at eight-thirty, in the presence of his brother, sister and her two children. Defendant and his brother about eight-fifty A. M. left his sister's home and met their father at Fifth and Troost Avenues. The three of them then walked to Fifth and Walnut, where defendant left his father and brother and went into a barber shop, and was given a haircut, shave and shine. The barbers, three or four in number, and the negro bootblack testified that he arrived there about nine-thirty A. M., or shortly before or shortly after, but their testimony estimated the time rather than fixed it definitely. Other facts, if any, germane to the issues raised, will be adverted to in the opinion.

I. Section 3230, Revised Statutes 1919, defines a killing that

occurs during the perpetration of a robbery murder in the first degree. Proof that the killing so occurred is admissible under an  indictment or information in the usual and common form. [State v. Meyers, 99 Mo. 107, 12 S. W. 516; State v. Brown, 119 Mo. 527, 24 S. W. 1027, 25 S. W. 200; State v. Foster, 136 Mo. 653, 38 S. W. 721; State v. Peak, 292 Mo. 249, 237 S. W. 466; State v. Adams, 316 Mo. 157, 289 S. W. 948.] Proof that defendant and others conspired together to commit an unlawful act and that the killing occurred while carrying out the conspiracy may also be shown under such an indictment or information. [State v. Carroll, 288 Mo. 392, 232 S. W. 699; State v. Parr, 296 Mo. 406, 246 S. W. 903.]

II. It is said that defendant was entitled, under the evidence, to a directed verdict of acquittal, because the State's evidence establishes, first, that defendant did not shoot and kill Smith; second,  that no conspiracy between defendant and others to kill Smith was shown. According to the instructions, the trial theory of the State was that, succeeding the bank robbery, defendant and others executed an understanding or common design to shoot and kill anyone appearing to be a menace to their escape. The evidence adduced adequately sustains the trial theory of the prosecution. The evidence developed an unlawful conspiracy to rob the trust company, which included the common design to escape with the loot and to shoot and kill any person appearing to interfere with their escape. Thus the homicide of Smith occurred while the conspirators were participating in the robbery of the bank (State v. Turco, 99 N. J. L. 96, 122 Atl. 844; Francis v. State, 175 N. W. 675; State v. McMahon, 145 Wash. 672, 261 Pac. 639), resulting that the instructions defendant submitted for acquittal were properly overruled. In this connection, in State v. Lewis, 273 Mo. 518, l. c. 531, 201 S. W. 80, the court say: "We hold that all the evidence in the case, including the circumstances of the killing of Dillon, shows clearly a conspiracy to murder whenever necessary in the course of defendants' business of stealing."

III. The only place in the instructions that a robbery is mentioned is in Instruction 1, defining first degree murder. It reads: "Murder in the first degree is the wilful, felonious, deliberate, premeditated killing of a human being and with malice aforethought, or any homicide in the perpetration or attempt to perpetrate any robbery." However, Instruction 2 shows the cause was not tried on the theory that the killing of Smith occurred during the robbery.

The trial theory of the State was that defendant and others deliberately conspired together to kill Smith as a menace to their escape. On this state of the record defendant submits that he was entitled to a second-degree-murder instruction on two grounds: first, Section 3232, Revised Statutes 1919, requires it; second, unless the cause was tried on the theory that the killing occurred in the perpetration of one of the crimes stated in Section 3230, the presumption obtains that any homicide is murder in the second degree.

(a) Section 3232, in part, reads: "Upon the trial of an indictment for murder in the first degree, the jury must inquire, and by their verdict ascertain, under the instructions of the court, whether the defendant be guilty of murder in the first or second degree." We have ruled for a period of fifty years that the preceding section may not be construed to require a second-degree-murder instruction, when the whole evidence tends to establish nothing except murder in the first degree or innocence. [State v. Hopper, 71 Mo. 425, l. c. 430-431; State v. Merrell, 263 S. W. 118; State v. Yeager, 12 S. W. (2d) 30; State v. Lewis, 273 Mo. 518, 201 S. W. 80.]

(b) It depends upon the circumstances attending the homicide whether the crime is shown to be murder in the first or second degree (State v. Hayes, 262 S. W. 1034, l. c. 1037). In State v. Lewis, 273 Mo. 518, 201 S. W. 80, the trial court ruled that the facts limited the instructions to murder in the first degree, and this court affirmed the ruling. The attending circumstances show nothing less than that defendant and others, to escape with their loot, deliberately conspired to shoot and kill any person appearing to hinder them in their escape. The facts show that they deliberately and in a cool state of blood planned the killing and carried it into execution. The evidence did not justify an instruction involving murder in the second degree.

IV. In State v. Williams, 274 S. W. 427, l. c. 434, may be found, with some immaterial changes, a reproduction of the State's Instruction 2. It reads in part: "In this connection, you are instructed that if you believe and find from the evidence in this case there existed an agreement or understanding between defendants, Carl Nasello, John Messino, Tony Mangercino, and others, or any of them, to aid and assist each other in the commission of the crime mentioned in the information and in the evidence. . . ." The instruction is said to be vicious for a number of reasons, which we proceed to determine.

(a) State v. Williams, 274 S. W. 427, disposes of the contention, adverse to defendant, that the instruction is erroneous because it is a mere abstract proposition of law. We need not further consider the question.

(b) It is said that, because the evidence shows the commission of other crimes by defendant and his confederates, *such as a killing, a robbery, the carrying of concealed weapons, and the firing of firearms in the street,* the instruction confused the jury and permitted them to speculate as to the crime mentioned in the information and the evidence. We do not think so. The instruction directed the attention of the jury to the only crime mentioned both in the information and the evidence, the killing of Smith. A conspiracy to kill any person unlawfully, if deemed necessary or convenient, coupled with the killing, even though the particular person was unknown or unheard of, is deliberate murder. The instruction did not confuse the jury or permit it to speculate, as to the crime intended. It directly referred to the killing of Smith.

(c) The instruction is said to be erroneous because it referred the jury to the information to determine the crime committed. Instructions that have referred juries to the indictment or information to ascertain the facts and issues have been condemned. [State v. McCaskey, 104 Mo. 644, 16 S. W. 511; State v. Constitino, 181 S. W. 1155; 16 C. J. 968.] However, as the jury must have understood that the crime mentioned in the information referred to the killing of Smith, we do not think the jury were confused or misled or permitted to speculate. We think the matter falls within the scope of the rulings found in State v. Murray, 91 Mo. 95, 3 S. W. 397, and State v. Nevitt, 270 S. W. 337.

(d) It is urged that that part of the instruction which authorized the jury to find that ''there existed an agreement or understanding between defendants, Nasello, Messino, Mangercino, and others, or any one of them, to aid,'' etc., permitted a finding of guilt without requiring a finding that defendant was one of the conspirators. The phrase, ''or any one of them,'' was meaningless, unless it qualified the words, ''and others,'' immediately preceding it. That it did so we think is evident. By the instruction the jury were compelled to find that Nasello, Messino, Mangercino and any one of others conspired to kill Smith. The instruction placed a greater burden on the State than was necessary, for it required a finding that Nasello, Messino and Mangercino were members of the conspiracy in addition to others, when it might properly have required a finding that Nasello, on the one hand, and Messino or Mangercino, or both, on the other hand, conspired together. Another instruction properly permitted the jury to find defendant guilty if, either alone or acting in concert with another, Smith was killed. While the instructions in that regard seem in conflict, yet as Instruction 2 placed a greater burden on the State than it was required to bear, the conflict becomes immaterial. In any event we think the jury understood that before they could convict

defendant, they were compelled to find beyond a reasonable doubt that he was one of the conspirators.

(e) Defendant contends that the instruction contains error because the evidence unequivocally shows that the robbery had come to an end, and because the evidence does not justify a finding that the conspirators agreed to aid each other to escape. We have heretofore held that the escape was a continuation of and within the *res gestae* of the robbery of the trust company. We have further held that a conspiracy existed to shoot and kill any one appearing to interfere with their escape, and thus to aid each other to escape. We need not discuss the assignment further than to say that it is immaterial and of no moment that prior to the act of escape the asportation of property of the trust company was sufficient to bring the offense of robbery into existence.

(f) Defendant avers that the evidence fails to show that he fired the fatal shot, but that it was fired by Messino, and, consequently, evidence is lacking that a conspiracy existed between defendant and others to kill Officer Smith, or that defendant had knowledge that it was intended or necessary to shoot Smith, or that the robbery plans contemplated such shooting, or that Smith was feloniously, unlawfully, deliberately, premeditatedly, or with malice aforethought shot. The brandishing of firearms and the promiscuous shooting by defendant and other occupants of the Buick coach were evidence of a conspiracy to shoot and kill any person appearing to interfere with their escape. It was not necessary that defendant fired the fatal shot to render him guilty, for, if defendant was a member of the conspiracy, he was responsible for any act by any of the conspirators done in furtherance of the conspiracy, whether or not the particular act was in contemplation of the defendant. [State v. Parr, 296 Mo. 406, 246 S. W. 903.] The evidence tends to show that defendant was a member of the conspiracy and that Smith was deliberately shot and killed. The guilt of defendant did not depend upon his firing the fatal shot.

(g) Defendant finally criticizes the instruction because, in authorizing a verdict of guilty, it ignores the defense of alibi. In a separate instruction the court directed an acquittal if the defense of alibi was sustained by the evidence. On this subject in State v. Glass, 300 S. W. 691, l. c. 694, we say: "The rule in civil cases ought to apply: That an instruction covering the whole case, and authorizing a verdict without reference to a defense which there is evidence to support, is error, but it is cured, if another instruction be given embodying that defense." The jury fully understood that if they believed the evidence sustained the alibi of defendant, they must acquit him.

V. It is argued that Instruction 3, by the phrase, *"in the manner and by some of the means mentioned in the information,"* permitted the jury to determine the issues and find the essential facts from the facts stated in the information. We think the instruction was favorable to defendant, for it told the jury that they must find beyond a reasonable doubt that defendant, either alone, or knowingly acting in concert with another or others, deliberately, etc., killed Smith. Moreover, the information was read to the jury. It charged, in the usual and common form, defendant with first degree murder for the killing of Smith. The manner and means of the killing as alleged in the information was with firearms charged with gunpowder and leaden bullets. The instruction did not confuse or mislead the jury. Analogous cases support our ruling. [State v. Murray, 91 Mo. 95, 3 S. W. 397; State v. Nevitt, 270 S. W. 337.]

VI. (a) The theory of Instruction 6 is not that of a killing occurring during the perpetration of a robbery, which Section 3230 defines as first degree murder, but the theory is that of a deliberate killing. Defendant not only denies that the evidence shows deliberation, but denies that it shows that defendant was connected with the killing of Smith. In view of these premises, he contends that the instruction constituted error. We have determined in preceding paragraphs of this opinion that the evidence establishes that defendant was connected with the killing of Smith through the conspiracy of which he was a member to shoot and kill any person appearing to menace their escape, and that the conspiracy to shoot and kill shows calculation and deliberation. We need not discuss the questions further.

(b) The concluding portion of the instruction reads: "And while it devolves upon the State to prove the wilfulness, deliberation, premeditation and malice aforethought, all of which are necessary to constitute murder in the first degree, yet these need not be proven by direct evidence, but may be deduced from all the facts and circumstances attending the killing, and if the jury can satisfactorily and reasonably infer their existence from all the evidence, they will be warranted in finding the defendant guilty of murder in the first degree."

We have consistently ruled that an instruction on circumstantial evidence is not warranted if the proof develops direct evidence of the offense charged, as it does in the instant case. [State v. Steinkraus, 244 Mo. 152, 148 S. W. 877; State v. Crone, 209 Mo. 316, 108 S. W. 555; State v. Lowry, 12 S. W. (2d) 469.] Notwithstanding, defendant contends that the instruction is erroneous be-

cause it did not correctly define circumstantial evidence. A reading of the instruction establishes that it was not intended as a circumstantial-evidence instruction; consequently a definition of such evidence was not necessary or warranted. Wilfulness, deliberation, premeditation and malice aforethought are concepts of the mind, which are ordinarily shown only by deductions from the facts and circumstances. The instruction did not purport to cover the facts and circumstances attending the conspiracy and the killing, but merely told the jury that wilfulness, etc., a state of the mind to be deduced from acts, may be deduced from the facts and circumstances in evidence. As the instruction did not purport to cover the field of circumstantial evidence, the defining of it was not required. It fairly advised the jury and they fully understood its purport and meaning, we think.

(c)  Defendant argues that the instruction did not require the jury to find wilfulness, etc., beyond a reasonable doubt, but that it permitted the jury to find them from merely satisfactory and reasonable evidence. It is impossible seemingly to cover every phase of the case in one instruction, and, reading the instructions as a whole, which must be done, we think the jury fully understood that, before they were authorized to convict defendant, they must find that he was guilty beyond a reasonable doubt. [State v. Ross, 300 S. W. 785.] In this regard Instruction 3 informed the jury unequivocally that before they could find defendant guilty of murder as charged in the information, they must find from all the evidence produced to it, and that beyond a reasonable doubt, that defendant, either alone, or knowingly acting in concert with another or others, wilfully, intentionally, deliberately, premeditatedly, on purpose and with malice aforethought killed Smith.

VII.  Instruction 8 is assailed. It is an instruction hypothesizing defendant's defense of alibi. After informing the jury that defendant was not guilty if he was in another and different place than that at which the alleged crime was committed at the time the said crime was committed, if it was, it then tells them that "in this connection you are instructed that if you have a reasonable doubt of the presence of the defendant at the time and place where said crime was committed, if you believe it was, you will acquit him."

The criticism of this instruction is that it places the burden on defendant to prove beyond a reasonable doubt that he was not present at the time and place where the crime was committed. Defendant cites State v. Hayes, 256 S. W. 747, in sustention of his position. A reading of the files in that case shows that the instructions there condemned are not at all similar. The instruction here criticised directs that if the jury have any reasonable doubt

as to defendant's presence on the occasion in question, they must acquit him. The instruction was not only proper, but fully protected defendant in that regard.

Defendant also says that his Instruction "D" should have gone to the jury. The instruction involved a presumption of innocence and reasonable doubt. As the court fully instructed the jury on these subjects, it was not error to refuse the instruction offered.

VIII. Instruction 10 is assailed. Practically all of the objections urged to this instruction were determined against the contentions of defendant in our examination of Instruction 2, and we need not again settle them. But the concept in it, that defendant alone killed Smith, is attacked on the ground that the record contains neither direct nor circumstantial evidence that defendant personally fired the shot that killed Smith. The evidence does not show with certainty the particular occupant of the Buick coach that shot Smith, but it does show with certainty that some one of the occupants shot and killed him. Smith was to the right of the coach as it traveled northwardly. The coach had one door only on the right-hand side and defendant sat next to it. The evidence tends to show that the man that shot Smith had one foot outside the door on the right-hand running board. This evidence was sufficient to justify the jury finding that defendant shot and killed Smith, even though he was not so identified with certainty. Be that as it may, Smith was killed in pursuance of an understanding or common design to shoot and kill any person appearing to menace the conspirators' escape. Taking either horn of the dilemma, defendant was guilty of first degree murder according to the State's evidence.

It is asserted that if another of the conspirators shot Smith from spite or ill-will, and not for the purpose of effectuating their escape, the others cannot be held responsible for the act. The evidence does not warrant the premise. It tends to show nothing else than that Smith was shot in furtherance of the conspiracy to effectuate the conspirators' escape.

IX. Defendant called to the witness stand his father, Joe Nasello. His testimony, on direct examination, was favorable to defendant, and tended to show an alibi, to the effect that defendant could not have been an occupant of the Buick coach at the time Smith was shot. On cross-examination he denied living at 1105 East Tenth Street as Joe Nelson, or paying rent thereon, but admitted that he often visited the place. He denied keeping a woman there under the name of Mrs. Nelson.

The question was repeated, whereupon, to an adverse ruling, defendant objected and excepted, but the question was not answered. He also denied eating and sleeping there, but admitting going there often to see Mrs. A. J. Nelson (his wife was deceased), because she was ill and needed assistance. There was no objection to the latter questions. On being recalled for cross-examination, he stated that he and Mrs. Nelson occasionally dined together at a specified cafe, but denied that the employees knew them as Mr. and Mrs. Nelson.

If not too remote in time, the admissibility of specific acts tending to impeach or disparage the testimony of a witness is largely within the discretion of the trial court. The rule is stated in Muller v. St. Louis Hospital Assn., 5 Mo. App. 390, l. c. 401 (affirmed in 73 Mo. 242), reading: ''When a witness is cross-examined, he may, in addition to the questions hereinbefore referred to, be asked any questions which tend to test his accuracy, veracity; or credibility, or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except where the answer might expose him to a criminal charge.'' [State v. Smith, 250 Mo. 350, 157 S. W. 319; State v. Long, 201 Mo. 664, 100 S. W. 587.] Moreover, the witness did not claim exemption on the ground that his answer might tend to incriminate him. [State v. Long, supra.]

X. Subsequent to the testimony of Joe Nasello, as detailed in the preceding paragraph, the court permitted three State witnesses to testify in rebuttal, over the objections and exceptions of defendant, that Nasello and Mrs. Nelson occasionally dined together at the College Cafe; that they supposed he was her husband; that they called him Mr. Nelson; that he did not deny his name was Nelson, although they did not know whether he understood the name, as he said nothing; and that they were in the restaurant infrequently.

As Nasello's testimony on direct examination as to his relations with Mrs. Nelson was a collateral matter, the State was bound by the answer of the witness. The court should not have permitted the introduction of such testimony in rebuttal. [State ex rel. Horton v. Clark, 9 S. W. (2d) 635; State v. Cox, 263 S. W. 215.] However, Nasello admitted on cross-examination, in effect at least, all matters elicited from the witnesses in rebuttal, except that they were known in the cafe as Mr. and Mrs. Nelson. The record contains no proof that defendant told anyone that his name was Nelson, or that he understood or recognized that the cafe employees called him Mr. Nelson instead of Mr. Nasello. The rebuttal testimony did not in fact impeach or discredit the evidence of the witness. We are

unable to surmise that the jury were influenced by the rebuttal evidence in reaching their conclusion. The influence actuating them was the strong and cogent evidence as to the identification of defendant in the bank during the robbery and in the Buick coach subsequently. The rebuttal evidence, while erroneous, was not prejudicial.

XI. (a) On cross-examination, defendant was asked if he owned an automobile, and he answered, "No." The State inquired whether he now owned a Buick coupe, and he replied, "No, sir; it belongs to my father." He stated that his father would not let him drive it, but said that he may have driven it once or twice. He denied driving the day Smith was killed, or the day before or the day before that. In rebuttal successive witnesses testified that a Buick was sold to Victor Maddi, and that defendant and others were with him when he purchased it. Later Maddi traded the Buick for a Hupmobile, and still later traded the Hupmobile for a Buick coach. One witness said he had never seen defendant driving a Buick, although he had seen him driving a Hupmobile sedan. The rebuttal proof tended to show that Maddi failed to make payments, that the Buick was repossessed, and that Joe Nasello came into the transaction and obtained title to the Hupmobile, which he traded for a Buick coupe. While the rebuttal evidence was immaterial, it was so foreign to any issue in the case or to any connection of the defendant with the offense on trial as to be non-prejudicial. Certainly the jury could not have been influenced by it in determining defendant's guilt.

(b) In rebuttal Officer Higgins, over defendant's objection that it was immaterial, testified that he had seen defendant several times driving a Hupmobile car. Certainly this evidence was immaterial, but, as it did not tend to impeach defendant, it cannot be held, for the reasons stated in subdivision (a) of this paragraph, prejudicial. Later Higgins was asked the question, "Did you talk with him at either time?" and he replied, "Yes, sir, I arrested him in this car." On motion the evidence was stricken out and the jury instructed to disregard it, but the discharge of the jury was denied. The statement that the officer arrested him did not establish that defendant was arrested for an offense of moral turpitude. It may have been for a traffic violation of a city ordinance. Be that as it may, we cannot speculate that the jury disregarded the court's instruction.

XII. The State's witness Lacey testified that he recognized defendant during the escape as an occupant of the Buick coach. On

cross-examination, objections were sustained to defendant's inquiries with respect to a divorce obtained by Lacey's wife on the ground that he associated with lewd women, and with respect to his association with lewd women prior to the divorce action. The court stated that he would permit the witness to answer with respect to his association with lewd women prior to the divorce action, but defendant did not take advantage of it. As to the substance of the divorce petition and the decree, the court seemingly sustained an objection as to parole evidence of what they showed, on the ground that it was not the best evidence, and gave defendant time to produce the records. The record fails to show that defendant offered records of any kind regarding the petition and decree. Under the circumstances, error as to these assignments was not sustained.

XIII. Error is assigned because the trial court failed to give converse instructions to the jury, but as defendant offered none, the court did not err in that regard. Moreover, a converse instruction was given in effect, for Instruction 2 concludes, "and unless you so find, you will acquit the defendant." [State v. Dougherty, 287 Mo. 82, 228 S. W. 786; State v. Cardwell, 312 Mo. 140, 279 S. W. 99.]

XIV. In his opening statement to the jury the prosecuting attorney said: "They are all charged with the murder of 'Happy' Smith. A severance was taken. Two of them have been tried and this defendant, Carl Nasello, is the third one of that gang of bandits that held up . . ." The trial court sustained defendant's objection to the statement, but refused to discharge the jury. It was then asked that the prosecuting attorney be reprimanded, and he inquired, "What have I done?" Defendant's counsel answered, "Referring to him as a bandit. I ask that he be reprimanded and admonished not to use the word 'bandit' again in that manner." The prosecuting attorney replied: "I certainly will use the word 'bandit' in the trial of the case—there is no way it can be tried without using it." The court overruled an objection to the statement and a request to discharge the jury. Defendant asserts that the preceding occurrence constitutes prejudicial error.

On the record before us the only alleged errors to be reviewed are the use of the word "bandit" by the prosecuting attorney and the refusal of the court to discharge the jury. The prosecuting attorney should not refer to the defendant as a "bandit" or its equivalent, a "robber." It was said by HENWOOD, C., in State v. Harmon, 317 Mo. 354, 296 S. W. 397, in forceful language that: "Applying unbecoming names or epithets to a man or woman on

468

trial is never excusable. This court has always looked with disfavor on this kind of conduct on the part of a prosecutor and in many instances held such conduct sufficiently prejudicial to constitute reversible error. However, this is a question which must, in each instance, be considered in connection with the nature of the case, all the facts and circumstances in evidene and all of the incidents of the trial.'' A defendant on trial should be referred to as defendant, man, person or by name. We understand that in English trials a reference to defendant is usually by name preceded by the appellation ''Mister.'' However, the context shows that the prosecutor merely referred to defendant descriptively and with decorum. The proof tended to show cogently that defendant was a bandit. Consequently we cannot believe that the jury was influenced by the statement to convict defendant, but .considered only the evidence in that regard. Thus, in our opinion, the statement was neither harmful nor prejudicial.

XV. The State's witness Meyers deponed that a certain Smith & Wesson revolver, introduced in evidence, passed from his possession to that of defendant on December 26, 1927. In addition, the evidence tended to show that the revolver was discovered in a cache with loot taken from the bank in the robbery. Meyers' testimony was admissible, in connection with defendant's presence in the bank and the Buick coach, as tending to show that defendant was a participant in the conspiracy to kill Smith. Competent, relevant and material evidence, correlated to the offense on trial, cannot be held inadmissible, because it tends to show defendant guilty of another and different crime. [State v. Sherman, 264 Mo. 374, 175 S. W. 73.]

XVI. ''Happy'' Smith's wife was permitted to testify as to his age, place of birth, the number of years he resided in Kansas City, and the length of his employment on the police force. The record does not tend to show that, by her presence on the witness stand or by her testimony, the jury were inflamed or prejudiced in this case.

XVII. On direct examination, a brother of defendant testified that defendant had lost weight. On cross-examination this question was asked: ''Q. You say your brother has lost weight—how much of the time in the last year has he been in jail?'' On defendant's objection the question was withdrawn and the jury instructed not to consider the question. It is a matter of common knowledge that persons charged with offenses are confined in jails. The occurrence fails to show that error obtained.

XVIII. On cross-examination defendant was asked the question, "Isn't it your car?" The question related to a Buick coupe purchased by Victor Maddi, which was repossessed by the vendor and later purchased by defendant's father. It was not shown that the Buick coupe was used in the robbery of the bank or the escape. The defendant objected and the prosecuting attorney in arguing the objection said: "Alibi is the essential point in this case, for him; he wants us to think he walked on crutches on that morning, and to account for the time; we will show, as to the Buick coupe, that he was driving it, driving it that day, and was seen in it that day and the day before, and that he owns it, and nobody owns it but him, and we have the right to lay the foundation first, by asking him, and let him talk, and bring witnesses before the jury to prove it to him." In our opinion the State failed to produce any evidence tending to show that defendant owned the Buick coupe or that he was ever seen driving it. The statement of the prosecuting attorney, if of any effect, tended to react against the State because it failed to show prima-facie that which was said would be established. The statement was nothing more than a statement of what the State expected to prove, which the State failed to sustain, and which cannot be held to be prejudicial. [State v. Rowe, 24 S. W. (2d) 1032, l. c. 1037.]

XIX. On the cross-examination the following occurred: "Q. Do you know Victor Maddi? A. Yes, sir. Q. He is a fugitive from justice, isn't he?" The defendant objected, and the court said: "Unless the matter that he is a fugitive from justice can be connected up in some way, that part is entirely immaterial. You can ask him if he knew the man." The prosecuting attorney said: "It will be connected up; it will show why we cannot produce him as a witness, because he is a fugitive from justice." The defendant objected to the statement, and the court ruled: "That is stricken out for the present time and withdrawn from the jury's consideration." We need not consider the question further than to say that the court not only did all that defendant asked, but that defendant failed to save an exception to the ruling of the court.

XX. The defendant objected to certain portions of the argument of the prosecuting attorney. The portions complained of are too lengthy to recite *in haec verba.* However, we will recite the gist of it sufficiently to be intelligible to the reader.

(a) In asking the death penalty he said that he would be as guilty of murder as any man that fired the fatal shot if he did not believe

in his own heart and in his own mind, if he did not know beyond a reasonable doubt, that defendant is guilty; that this gang of bandits cannot be broken up, or highway robbery or murder stopped by being easy with them; that with the aid and help of juries, banditry in Jackson County would be broken up in a very short time. To this portion of· the argument the defendant made no objection nor saved an exception, and therefore the matter is not open to consideration.

(b) Thereafter the prosecuting attorney argued to the jury that when they left, it was up to them to face their families; that if they believed him innocent, it was their duty to acquit him, but if they believed him guilty, then, it was for their conscience to make the explanation to their wives, their families, their neighborhood and the citizenship of the county. This argument goes no further in our opinion than telling the jury that if they believe the defendant is guilty, then it is their duty to convict him. Moreover, if there was any error in the argument, it was cured by the ruling of the court: ''The jury will discharge their duty, and do not have to explain to anybody.''

(c) Over the objection and exception of defendant, the argument was resumed: ''All right, gentlemen, if you believe this man is guilty and you do not assess the death penalty I won't have to explain that to anybody on the face of the earth. I will not have to explain it to the people of Jackson County; I will not have to explain it to my God; I will not have to explain it to my wife; I won't have to explain it to anybody in this court room, because I have done everything in my power to mete out the punishment to this defendant that ought to be meted out to him, not only on his account alone, but on the account of others. I am doing all in my power, these detectives that have been in here have done all in their power—somebody pointed out the chief sitting here a while ago—I don't see him now—he has done all in his power, to stop murder and banditry in Kansas City, and if it is not stopped—and I weigh my words well when I say it—if it is not stopped, you twelve men are responsible for it not being done. (The defendant objected as an attempt to intimidate the jury and asked that it be withdrawn, which the court overruled.) You go out and do your duty as you see it. I am telling you about this thing as I see it, as I look at it, and I say again, if he is not guilty, turn him loose; if he is, bring in the kind of a verdict that red-blooded American citizens of the Heart of America ought to bring in.''

One phase of the argument of the prosecutor, provided they believed the defendant guilty, urged that the death penalty was warranted by the evidence as he viewed it. Moreover, he not only informed them that the responsibility rested on them, but advised

them to do their duty as they saw it. If the jury believed the defendant was guilty, it was their duty to return such verdict, and that was all the prosecutor asked, except that he urged, if they so found, the death penalty. We are unable to see any vice in the argument, for he was warranted in urging it.

The other phase of the argument assailed relates to the suppressing of murder and banditry in Kansas City, and the responsibility of the jury relative thereto. The effect of the argument was to advise the jury the prosecutor believed the evidence warranted the conviction of defendant, and that the responsibility of suppressing murder and banditry rested upon juries, when cogent evidence of guilt was produced to them. It was said, on this subject, in State v. Lynn, 23 S. W. (2d) 139, l. c. 141, ''The prosecutor has the right to urge the jury to uphold the law, and to draw proper inferences as to the effect of the failure of the jury to uphold the law. [State v. Marshall, 317 Mo. 413, 297 S. W. 63.]'' No error appears with respect to the argument of the prosecutor.

XXI. The preceding paragraphs cover the errors assigned in the brief of defendant. In addition, we have examined the record proper, and the assignments of error in the motion for a new trial, and, after due consideration, we are unable to discover any error therein.

The judgment must be affirmed. It is so ordered. *Henwood* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur and date of execution ordered on and for July 25, 1930.